**HOSPITALITY TEMPS
CORP., Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 04–TX–1599.**

District of Columbia Court of Appeals.

Argued Jan. 23, 2007.
Decided May 24, 2007.

William J. Kenney, Washington, DC, for appellant.

Mary T. Connelly, Assistant Attorney General, Office of the Solicitor General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Edward E. Schwab, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN, KRAMER, and BLACKBURNE–RIGSBY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

Appellant, Hospitality Temps Corporation ("HTC"), was issued a Notice of Tax Deficiency by the Office of Tax and Revenue ("OTR") pursuant to D.C.Code §§ 47–2002 and 47–2001 (2001) for failure to collect and pay sales and use tax. OTR denied appellant's motion appealing the tax assessment. Appellant next appealed to the Tax Division of the Superior Court pursuant to D.C.Code §§ 11–1201 and 47–2021(a) (2001). In reviewing the parties' cross-motions for summary judgment, the trial court found that HTC was properly assessed the sales and use tax and granted the District's summary judgment motion.

HTC raises five issues on appeal. First, appellant contends that it does not provide "real property maintenance services" and further, that the hotels it leases [1] its employees to are co-employers, thereby entitling appellant to an exemption. Second, appellant argues that the relevant statutes and regulations are ambiguous and therefore their application to appellant's services is improper. Third, appellant contends that even if its services fall within those covered by the statute, appellant is exempt under the "sale for resale" exemption. Fourth, appellant argues the District of Columbia is equitably estopped from assessing tax liability against it. Fifth, appellant asserts that it has been denied equal protection because not all similarly situated vendors have been assessed a tax liability. We conclude that none of these issues warrant a reversal of the tax court's decision and we *affirm*.

## I.

Hospitality Temps Corporation ("HTC") is a temporary staffing company that employs individuals and then leases these employees to a variety of District of Columbia businesses. Hotels are HTC's primary clients with HTC employees hired to perform a variety of housekeeping services. These services include, but are not limited to: cleaning bathrooms, changing bed linens and making beds, dusting furniture, vacuuming, emptying trash, and restocking bathroom and room supplies.

In 1998, the Office of Tax and Revenue ("OTR") conducted an audit of a major D.C. hotel. This audit uncovered payments from the hotel to HTC for services subject to sales tax. HTC's invoices to the hotel indicated that sales tax was not charged for the sale of its temporary services. As a result, OTR conducted an audit of HTC and discovered that HTC had received payments for real property maintenance services on several occasions. OTR determined that these services were subject to taxation under D.C.Code §§ 47–2002 and 47–2001. OTR found that HTC was in violation because it had not charged sales tax to its clients for these services and had not remitted such sales tax to the District. HTC's tax deficiency was determined to be for the period of May 1, 1995 to March 31, 1998.

As a result of the audit findings, on August 17, 1998, OTR issued a Notice of Tax Deficiency in the amount of $19,960.13 in base tax against HTC for uncollected or unremitted sales tax for the tax deficiency period. This figure was calculated by applying a tax rate of 5.75% to HTC's gross receipts of $347,123.77. *See* D.C.Code

---

1. Throughout the opinion, when we refer to "leasing employees," we are referring to selling selected services, primarily housekeeping services, of employees to various District businesses. *See* D.C.Code § 47–2002.

§ 47–2002 (setting out the tax rate). On January 5, 1999, after an informal conference between HTC and OTR, OTR issued a revised Notice of Tax Deficiency reducing the deficiency to $3,705.85 in base tax, $2,031.54 in interest, and $926.46 in penalties. The tax period covering the deficiency was also extended from March 31, 1998 to April 30, 1998.

HTC appealed the tax assessment and on August 9, 1999, OTR denied the appeal following a hearing. The hearing officer found that the unambiguous language of the relevant statutes make it clear that HTC is liable for sales and use tax on housekeeping services sold to various hotels in D.C. HTC paid the tax assessment, including the interest and penalties[2] in December 1999 and January 2000. Subsequently, on February 1, 2000, HTC appealed the OTR hearing officer's decision in the Tax Division of the Superior Court pursuant to D.C.Code §§ 11–1201 and 47–2021(a) (2001). The parties cross-moved for summary judgment following discovery.

The trial court characterized the issue on appeal as whether custodial, janitorial, housekeeping, and cleaning services performed by HTC employees who were leased to various clients, are subject to taxation under D.C.Code § 47–2002 as a "retail sale" and "sale at retail." The trial court found, *inter alia*, that the services performed by HTC employees fall within the purview of the statute and that HTC was therefore properly assessed the tax. The court denied HTC's summary judgment motion and granted appellee's summary judgment motion on December 1, 2004.

## II.

■ We review decisions in civil tax cases in the same manner as other deci-

sions of the court in civil cases tried without a jury. *District of Columbia v. Acme Reporting Co.*, 530 A.2d 708, 712 (D.C. 1987) (citation omitted); *see also* D.C.Code § 17–305(a) (2001). We will not set aside the tax court's judgment, except for errors of law, *see Riggs v. Aetna Insurance Co.*, 454 A.2d 818, 820 (D.C.1983), and will not upset the ultimate legal conclusion of the tax court when its outcome necessarily follows from its findings of fact. *Acme Reporting Co., supra*, 530 A.2d at 712; *see also District of Columbia v. Washington Sheraton Corp.*, 499 A.2d 109, 111 (D.C. 1985); *Rock Creek Plaza–Woodner Ltd. P'ship v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983); *District of Columbia v. Nat'l Bank of Washington*, 431 A.2d 1, 3 (D.C.1981).

■ We conduct an independent review of whether a summary judgment motion was improperly granted, and apply the same standard as the trial judge. *Bailey v. District of Columbia*, 668 A.2d 817, 819 (D.C.1995). If, viewing the record in the light most favorable to the non-moving party, we conclude that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the judgment of the trial court will be affirmed. *See Kibunja v. Alturas, L.L.C.*, 856 A.2d 1120, 1127 (D.C.2004); *Lee v. Luigi, Inc.*, 696 A.2d 1371, 1373 (D.C.1997); *see also District of Columbia v. Casino Assocs.*, 684 A.2d 322, 325 (D.C. 1996) (we defer to "reasonable administrative understandings of uncertain legislative commands" in the taxation context).

## "Real Property Maintenance Services" & "Employer–Employee" Exemption

■ HTC contends that the District of Columbia has adopted an improper inter-

---

**2.** HTC paid $3,705.82 in base tax, $2,142.72 in interest, and $926.46 in penalties.

pretation which extends the definition of "real property maintenance services" under D.C.Code §§ 47–2002 and 47–2001 and that such an extended interpretation is an "effort of back door amendment to the Tax Code." The trial court denied appellant's summary judgment motion based primarily on its finding that the custodial, janitorial, housekeeping, and cleaning services performed by HTC employees are taxable as "retail sale," and "sale at retail" services. D.C.Code § 47–2002 provides:

> A tax is imposed upon all vendors[3] for the privilege of selling at retail certain tangible personal property and for the privilege of selling certain *selected services* (defined as "retail sale" and "sale at retail" in this chapter).

"Retail sale" and "sale at retail" are defined as "the sale in any quantity or quantities of any tangible personal property *or service*...." D.C.Code § 47–2001(n)(1) (emphasis added). Included as a term under the definition of "retail sale" and "sale at retail" is the *"sale of or charges for the service of real property maintenance* and landscaping," which is defined as follows:

> For the purposes of this paragraph, the term *"real property maintenance" means any activity that keeps the land or the premises of a building clean, orderly, and functional,* including the performance of minor adjustments, maintenance, or repairs which include: floor, wall, and ceiling cleaning; pest control; window cleaning; servicing inground and in building swimming pools; exterior building cleaning; parking lot, garage, and recreation area maintenance; exterior and interior trash removal; restroom cleaning and stocking; lighting maintenance; chimney and duct cleaning; and ground maintenance; but does not include; painting, wallpapering,

or other services performed as part of construction or major repairs; or services performed under an employee-employer relationship.

D.C.Code § 47–2001(n)(1)(M)(i)(I) (emphasis added). The term "real property maintenance" is further defined in 9 D.C.M.R. § 472 (1998) as "the activities of keeping the land or premises of a building clean, orderly and functional, including performing minor adjustments, maintenance or repairs." Examples of such activities included in the regulation are:

(a) Wall and ceiling cleaning;

(b) Pest control;

(c) Exterior and interior window cleaning;

(d) Floor (hardwood or tile) cleaning;

(e) Restroom cleaning and stocking;

(f) Exterior and interior trash removal;

(g) Maintenance of inground or indoor swimming pools;

(h) Exterior building cleaning;

(i) Chimney and duct cleaning;

(j) Parking lot, garage and recreational area maintenance; and

(k) Ground maintenance

Based on the above statutory framework, the trial court found, *inter alia*, that the services performed by HTC temporary employees were within the category of "real property maintenance." The trial court found that the language of the statute is unambiguous and clearly leads to the conclusion that the services performed by HTC employees are subject to the sales and use tax of D.C.Code § 47–2002. We agree.

The crux of appellant's argument on appeal is that it does not engage in real property maintenance as defined in

---

**3.** The term "vendor" includes a person or retailer selling property or rendering services upon the receipts from which a tax is imposed under D.C.Code § 47–2001.

D.C.Code § 47–2001(n)(1)(M)(i)(I) in that it does not "employ individuals with real estate maintenance skills and has never dispatched employees to a hotel's real estate maintenance department." Appellant also maintains that the hotels that lease HTC'S employees become "co-employers" when the employee is working on their site. HTC also maintains that it has "no control over the work assignment, assumes no responsibility for the work performance of the individual and does not supervise or control the work assignments." Appellant contends that the statute is clear that the work at issue is not subject to tax if performed by the hotel's own employees. Each of HTC's contentions are flawed in several respects.

■ The first step in construing a statute is "to read the language of the statute and construe its words according to their ordinary sense and plain meaning." *Baghini v. District of Columbia Dep't of Employment Services,* 525 A.2d 1027, 1030 (D.C.1987) (quoting *United States v. Bailey,* 495 A.2d 756, 760 (D.C.1985) (citation omitted)). The language in D.C.Code § 47–2001(n)(1)(M)(i)(I) is unambiguous and requires no interpretation. As noted by the government, the activities set out in the statute which comprise real property maintenance could not be clearer: it imposes a tax on the custodial, cleaning, janitorial, and attendant services that HTC's employees provide. Real property maintenance is defined in the statute as *"any activity* that keeps the land or the premises of a building clean, orderly, and functional." *Id.* (Emphasis added). It is axiomatic that "housekeepers," "room attendants," "janitors," and "custodians" provide cleaning services and ensure that the premises of a building are kept clean, orderly and functional.

HTC never disputes that its employees perform common custodial, janitorial, housekeeping, and cleaning services, such as floor, wall and ceiling cleaning, window cleaning, trash removal and restroom cleaning, all of which are enumerated as taxable under the statute. Instead, HTC simply disputes their characterization as real property maintenance services. The activities performed by HTC's employees, and those listed on its invoices supplied to the OTR during its audit, are similar, if not identical, to the activities listed in the statute and regulations as real property maintenance activities. OTR appended a schedule of taxable services to its second Notice of Tax Deficiency, which was prepared using information from HTC's invoices. Included in these invoices were job descriptions such as "housekeeper," "room attendant," "janitor," "custodian," and "cleaning." Appellant does not cite any authority to support its contention that its employees do not provide real property maintenance services.

■ Appellant next contends that the hotels to which it leases its employees become co-employers. The evidence contradicts this contention and instead, shows that HTC's employees remain their employees even when they are on assignment. Appellant concedes that it "performs all personnel management responsibilities inherent in the employer-employee relationship," including performing payroll services, providing insurance, and issuing paychecks. Appellant contends, however, that the hotel becomes the "co-employer" when the individual is working at its work site and that HTC has no control over the work assignment, assumes no responsibility for the work performance of the individual and does not supervise or control the work.

Although HTC is correct in contending that real property maintenance services performed under an employer-employee relationship are exempt from the sales and

use tax under D.C.Code § 47–2001(n)(1)(M)(i)(I), this exemption is inapplicable here. HTC's argument, that when its employees are on assignment they are the hotel's employees rather than HTC's employees, is belied by its very own contrary position articulated in its briefs that the hotels buy the services from HTC to avoid the employer-employee relationship. HTC has not provided any evidence to support its assertion, such as an affidavit from any one of its clients acknowledging they are co-employers. Additionally, in its brief, HTC not only refers to its workers as "employees" seven times in the span of two pages, but also admits that it "performs all personnel management responsibilities inherent in an employer-employee relationship." In light of these representations, HTC cannot now disclaim its employer-employee relationship with the workers whose services it sells.

HTC further argues that the statute was not intended to apply to temporary staffing services. However, this assertion is refuted by the regulations which expressly exclude temporary help workers from the "employer-employee" exemption. *See* 9 D.C.M.R. § 472.4 ("Workers provided under temporary help service contracts or under other agreements are not considered employees for the purpose of this section."); *see also* 9 D.C.M.R. § 472.13 (2001) ("Vendors providing temporary help to perform real property maintenance shall be required to collect the sales tax on the charges for that service.").

**Application of the D.C. Code & Regulations**

Appellant argues that the tax assessed under D.C.Code § 47–2001 is, in effect, a tax on the hotel industry. Appellant further contends that the hotel industry is such a major source of D.C. tax revenue, that if the D.C. Council intended to impose additional taxes on the hotel industry, it would have held hearings, provided notice, and would have used terminology generally prevailing in the affected industry. We are persuaded otherwise because the language of the statute is not tailored to a specific industry on its face, nor does the legislative history make reference to any particular industry. Accordingly, it cannot be said that the D.C. Council intended to limit the industry to which this tax applies.

The statute is clearly aimed at any and all vendors of real property maintenance services, as defined in the statute. The services within the scope of taxable real property maintenance services include certain services sold by vendors of housekeeping, maintenance or cleaning services to a variety of customers, such as hotels, apartments, office buildings, public institutions, schools, or private households. The statute specifically addresses vendors such as HTC—if the services of temporary help are sold, the services are subject to tax if the underlying service is taxable. *See* 9 D.C.M.R. § 472.13. The statute and regulations unequivocally show that the services sold by HTC are subject to sales and use tax.

Appellant argues that the term "real property maintenance" defined in D.C.Code § 47–2001 is vague and obscure. Appellant cites *Acme Reporting Co., supra,* to support its argument that the statute is ambiguous and that tax codes must be strictly construed and the obligation must be clearly and explicitly established to justify the District of Columbia's imposition of a tax. In *Acme Reporting Co.,* we addressed the issue of whether court reporting services are "public stenographic services" for purposes of taxation under D.C.Code §§ 47–2001(n)(1)(H) and 47–2201(a)(1)(G) (1981). In November 1969, the Department of Finance and Revenue ("DFR") sent a notice to all registered sales and use taxpayers concerning the

1969 amendments imposing sales and use taxes on public stenographic services. This notice, however, did not define the term "public stenographic services." When the DFR promulgated a regulation to define the term "public stenographic services," the regulation simply stated that "the term public stenographic services includes typing services." 9 D.C.M.R. § 468.3 (1986); *Acme Reporting Co., supra,* 530 A.2d at 710. Thus, the court was faced with the task of determining what services Congress intended to cover by its use of the term "public stenographic services," and not the term "real property maintenance," as we are confronted with in this case.

In determining what services Congress intended to cover by its use of the term "public stenographic services" in *Acme Reporting Co.,* we stated that "tax laws are to be strictly construed against the state and in favor of the taxpayer, if the statute in controversy is unclear and ambiguous." 530 A.2d at 712 (internal quotation marks and citations omitted). "At the same time, we [were] mindful of the maxim that tax laws ought to be given a reasonable construction, without bias or prejudice against either the taxpayer or the state, in order to carry out the intention of the legislature and further the important public interest which such statutes subserve." *Id.* (internal quotation marks and citations omitted). Finding the plain language of the code and the legislative intent unclear, we were persuaded in *Acme Reporting Co.* that the term "public stenographic services" was not meant to include court reporters, and that such an inclusion would be inconsistent with the legislative history of the District's sales and use tax measures as enacted by Congress. *Acme Reporting Co., supra,* 530 A.2d at 713.

While we hold that our reasoning in *Acme Reporting Co.* remains sound, the facts presented in that case are quite different than the facts of the case at hand. The term "real property maintenance" is not only defined in D.C.Code § 47–2001(n)(1)(M)(i)(I), but the statute includes a list of activities that fall within the definition. Unlike in *Acme Reporting Co.,* the statutory language here is clear and gives a taxpayer notice of their tax obligations upon a plain reading. Further, although HTC argues that the OTR made no effort to inform the hotel industry of its tax obligation, OTR did just that. The Department of Finance and Revenue, predecessor to OTR, prepared informational pamphlets regarding the new legislation stemming from the 1989 Revenue Act (relevant portions of the Act are codified at D.C.Code § 47–2001, *et seq.*) and mailed these pamphlets to all businesses registered in the District of Columbia. The pamphlet included information about the legislation and a guide to the newly taxable real property maintenance services. The notice specifically stated that the District of Columbia's sale and use tax laws had been amended effective July 1, 1989 and listed new services subject to the sales and use tax. Real property maintenance services were among those services listed as subject to the new tax scheme, and defined exactly as it currently appears in D.C.Code 47–2001(n)(1)(M)(i)(I). Accordingly, appellant's assertion that the term "real property maintenance services" is vague, is simply without any merit.

### "Sale For Resale" Exemption

■ Appellant argues that even if the transactions in issue are considered "real property maintenance" and subject to the sales tax, it is exempt from the tax as a "sale for resale" pursuant to D.C.Code § 47–2005(n)(1). Appellant maintains that the housekeeping services it provides to hotels are covered by the exemption because the cost of cleaning rooms is includ-

ed in the room rental charges assessed to guests. A plain reading of the statute, however, compels our rejection of this claim. The statute provides, in pertinent part:

> Said term shall mean *all sales of tangible personal property* to any person for any purpose *other than those in which the purpose of the purchaser is to resell the property so transferred* in the form in which the same is, or is to be, received by him, or to use or incorporate the property so transferred as a material or part of other tangible personal property to be produced for sale by manufacturing, assembling, processing, or refining.

D.C.Code § 47–2001(n)(1) (emphasis added). This exemption clearly states that it applies only to the sale of tangible property. Appellant does not sell tangible personal property. Appellant sells "services," making the sale for resale exemption inapplicable. The D.C. Circuit has held that even tangible property may not always fall within the exemption where it is used in the conduct of business, but was not purchased for resale within the meaning of the statute. *See e.g. Hotels Statler Co., Inc. v. District of Columbia*, 199 F.2d 172 (D.C.Cir.1952) (holding that the sale for resale exemption did not apply to personal property such as tableware, bed linens, towels, and light bulbs purchased by the hotel and used by the guests). Where even certain tangible property cannot be exempted merely because the costs of such property are passed on to guests through hotel room charges, cleaning services, likewise, cannot be said to be "resold" to hotel guests. The trial court properly rejected this claim.

### Equitable Estoppel

Appellant also claims that even if the tax has been properly assessed, the District is equitably estopped from collecting the tax because it is a retroactive tax. Appellant argues that the District of Columbia's inaction for "some 10 years following enactment of the amendment suggests the District's Tax Authorities in fact recognize the transactions are free from taxation." Appellant further contends that a tax may not be applied to transactions made before its enactment without violating the due process requirements of the Fifth Amendment. We reject both claims.

The trial court found that the tax is not retroactive because the taxable events did not antedate the legislation. The Revenue Amendment Act of 1989, which authorized the imposition of the sales and use tax, went into effect July 26, 1989. The sales tax assessed against HTC was for the period May 1, 1995 through April 30, 1998. Thus, the taxable events took place six years after the enactment of the statute.

 Additionally, in order to successfully raise an estoppel argument against the District, appellant "must show that the District made a promise, that [HTC] suffered injury due to reasonable reliance on the promise and that enforcement of the promise would be in the public interest and would prevent injustice." *District of Columbia v. McGregor Properties, Inc.*, 479 A.2d 1270, 1273 (D.C.1984). There is no evidence in the record to show that the District made any promise to HTC not to tax its sale of real property maintenance services.

### HTC's Equal Protection Rights

 Finally, appellant argues that the District of Columbia assessed a tax on HTC that was grossly unequal to the tax assessment on comparable vendors of such services during the same tax period and this denies HTC its equal protection rights. Appellant also claims that the District has targeted it for harassment and

discrimination by collecting this tax ten years after the enactment of the Revenue Amendment Act, while failing to enforce the tax provision against vendors of similar services.

■ To support a defense of selective enforcement or discriminatory prosecution, appellant must show that the government's selection of it for prosecution has been "based upon some form of invidious or otherwise impermissible form of discrimination, or is arbitrary and capricious." *United States v. Smith*, 354 A.2d 510, 512–513 (D.C.1976) (citing *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)). The trial court findings show that it was the audit of a third party that led to the discovery of the sales tax omission by HTC, and HTC's subsequent audit and notice of deficiency. Contrary to appellant's contention, application of the tax law to HTC is not the result of any discrimination, but rather the District's inability to turn a blind eye to the tax deficiency that the third party audit revealed. The appellant has not presented evidence that would show otherwise and accordingly we find that the trial court properly rejected this claim.

For the foregoing reasons, we affirm the December 1, 2004 Order of the trial court denying appellant's Motion for Summary Judgment and affirming the tax assessment of the Office of Tax and Revenue against appellant.

*So ordered.*