**2461 CORPORATION t/a Madam's Organ Restaurant, Petitioner,**

v.

**DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD, Respondent.**

No. 06–AA–523.

District of Columbia Court of Appeals.

Argued Dec. 7, 2007.
Decided June 12, 2008.

Richard J. Bianco for petitioner.

Richard S. Love, Senior Assistant Attorney General, with whom Linda Singer, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, then Deputy Solicitor General, were on the brief, for respondent.

Before FISHER and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

THOMPSON, Associate Judge:

Petitioner 2461 Corporation does business as "Madam's Organ," a restaurant located at 2461 18th Street, N.W., in the Adams Morgan neighborhood. In an order dated May 5, 2006, the Alcoholic Beverage Control Board ("the Board") imposed sanctions on petitioner for having made a substantial change in the restaurant's operations—specifically, a change in occupancy—without Board approval. Peti-

tioner contends that the Board's finding about a substantial change in operations is not supported by substantial evidence in the record. We agree, and therefore vacate the Board's ruling.

I.

On April 23, 2005, an Alcoholic Beverage Regulation Administration ("ABRA") investigator, Willie Parker, conducted a compliance review of petitioner's establishment. The investigator met with one of petitioner's officers and performed a "walk-through." At the conclusion of the "walk-through," the two agreed that there were approximately 203 patrons in the establishment.[1] Thereafter, the Board issued a Notice to Show Cause why the Board should not revoke or suspend petitioner's alcoholic beverage license. The Show Cause Order set out the following charge:

You made a change in the occupancy of the licensed establishment which substantially alters the nature of the operation of the licensed establishment, as set forth in the initial application for the license, without obtaining approval of the Board, in violation of D.C. Official Code 25–762(a) (2001).

On May 3, 2006, the Board held a hearing on the matter, at which Investigator Parker and Mr. Duggan testified. At the conclusion of the hearing, the Board voted to suspend petitioner's license for five days and also fined petitioner $500.[2]

1. According to the testimony of William Duggan, petitioner's President, the first floor of Madam's Organ has a stage for live music, a mezzanine with table seating, and several bar areas. The second floor has a pool table, a couch, a chair and a fireplace. The third floor has a small lounge area with a bar, a couple of couches, and a fireplace. There is also a rooftop deck. There is food service on the first floor and roof areas. Investigator Parker estimated that there were 70 patrons on the first floor, 70 patrons on the second floor, 30 patrons on the third floor, and 30 patrons on the rooftop at the time of the April 23, 2005 inspection.

2. Execution of the sanction has been stayed pending a decision by this court.

In its May 5, 2006 written order, the Board noted that petitioner holds a class "CR" Retailer's license,[3] for which it first applied in 1997. In its Conclusions of Law, the Board found that petitioner "listed in its initial application for a new Class 'CR' Retailer's license that its capacity will be 99 patrons," that petitioner's "request for a capacity of 99 is consistent with [petitioner's] April 18, 1997 certificate of occupancy for 99 seats that was submitted with [petitioner's] August 13, 1997 [license] application," and that petitioner "holds and has paid for a CR01 license which is for licensed restaurants with a capacity of 99 or fewer patrons." The Board found that the establishment "did increase its Board approved occupancy of the establishment from 99 patrons to approximately 203 patrons, in violation of D.C. Official Code § 25–762 (2001),"[4] and that petitioner was guilty of the charged violation, i.e., making a "change in the occupancy of the licensed establishment, without obtaining the approval of the Board."

The Board rejected petitioner's "suggest[ion] to the Board to interpret the establishment's certificate of occupancy and those portions of [petitioner's license] application where the term 'seats' are [sic] used to refer to a seated person and not [to] include standing patrons." The Board concluded that petitioner had changed its occupancy notwithstanding Mr. Duggan's testimony that "through the years," operations at Madam's Organ had "always been the same."

## II.

This court reviews the factual findings of the Board with deference, reversing only if the findings are not based on substantial evidence in the record as a whole. See *Levelle, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 924 A.2d 1030, 1035 (D.C.2007); D.C.Code § 2–510(a)(3)(E) (2001). "Substantial evidence has been defined as 'more than a mere scintilla'; i.e., 'such relevant evidence as reasonable minds might accept as adequate to support the conclusion.'" *Kopff v. District of Columbia Alcoholic Beverage Control Bd.*, 381 A.2d 1372, 1387 (D.C. 1977) (citation omitted). Our task, therefore, is to "assess ... the logical connection between the evidence and conclusions...." *Id.* at 1387 n. 26 (citations and internal quotation marks omitted). There must be "a demonstration in the findings of a 'rational connection between facts found and the choice made.'" *Id.* at 1387, quoting *Brewington v. District of Colum-*

3. The "C" means that the establishment is licensed to sell beer, wine and spirits at retail for on-premises consumption, and the "R" means that petitioner's establishment is a restaurant. See D.C.Code §§ 25–113(a)(2)(A) and (b)(1) (2001).

4. D.C.Code § 25–762(a) provides that "[b]efore a licensee may make a change in ... any licensed establishment, which would substantially change the nature of the operation of the licensed establishment as set forth in the initial application for the license, the licensee shall obtain the approval of the Board." Among the changes subject to Board approval is an "[i]ncrease [in] the occupancy of the licensed establishment." *Id.*, § 25–762(b)(1).

As provided in 23 DCMR § 23–503.1, the Board "may fine, revoke, or suspend a license ... when a license holder has been found to have made a substantial change in operations ... without Board approval." This provision appears to give the Board the authority to suspend *or* fine, but not both. Cf. *In re Bruce*, 97 N.C.App. 138, 387 S.E.2d 82, 83 (1990) (holding that where statute provided that licensing board could sanction an engineer by suspending his certificate of registration or levy a fine, board exceeded its authority in both suspending the petitioner's license and fining him). Here, the Board both suspended petitioner's license and imposed a fine. However, because petitioner did not raise this as an issue before this court, we do not rely on it as a basis of our decision.

*bia Bd. of Appeals & Review*, 299 A.2d 145, 147 (D.C.1973). "We review the legal conclusions of an agency *de novo.*" *Levelle*, 924 A.2d at 1035. We will accord considerable weight to an agency's construction of the statutes and regulations that it administers where the meaning of the language is not clear on its face, but "the judiciary is the final authority on issues of statutory [and regulatory] construction." *Id.* at 1035–36 (citation omitted).

## III.

■ We are persuaded that the Board's decision in this case is not supported by substantial evidence in the record as a whole and that there is not a logical connection between the facts that the Board found in this case and its conclusion that petitioner made a substantial change in its operations, *i.e.*, a change in the occupancy of its establishment, without Board approval.

For its conclusion that petitioner made a change in occupancy by having 203 patrons in its establishment on the inspection date, the Board relied first on its finding that petitioner "listed in its initial application for a new Class 'CR' Retailer's license that its capacity will be 99 *patrons* " (italics added). The record, however, does not support this finding. Petitioner's initial license application contains a page on which petitioner checked lines indicating

that its establishment would be a restaurant with a "Capacity" of 99. The initial application also contains a supplemental "Food Statement" containing spaces for the license applicant to enter its "Seating Capacity" and "Number of Patrons to be Seated." On both lines on petitioner's application, the number "100" is handwritten.[5] In our view, neither of these pages nor anything else in the license application can fairly be read as describing or establishing a limit on the number of *patrons* (as opposed to a limit on the number of *seats* ) that the establishment could have.

The fact that petitioner indicated on the license application that its restaurant would have a "capacity" of 99 cannot reasonably be read to impose a limit on 99 patrons because the pertinent ABRA regulation does not assign that meaning to the term "capacity." *See* 23 DCMR § 208.10. Section 208.10 provides that the annual license fee for Class C licenses "shall be based on the certificate of occupancy for the establishment." The regulation then goes on to specify that the license fee for a CR restaurant with a "capacity" of "99 or fewer" shall be $1,000. Thus, section 208.10 employs the term "capacity" to mean the number of seats specified on an establishment's certificate of occupancy. The regulation nowhere states that a restaurant's "capacity" is the maximum number of patrons that may be in the establishment at any one time.[6]

---

**5.** The record contains no explanation for the discrepancy between the 99 seats specified on petitioner's certificate of occupancy and the 100 "patrons to be seated" specified on petitioner's license application.

**6.** To be sure, this is not the first case in which the Board has construed a restaurant's certificate of occupancy to establish the number of patrons that the restaurant may have at any one time. *See, e.g., In re The Hair Club, Inc. t/a Nate's Comfort Zone*, 50 D.C.Reg. 7865 (Sept. 19, 2003) (noting that the certificate of

occupancy permitted the establishment to have 40 seats, *id.*, at 7866, and thereafter referring to the establishment's "certificate of occupancy of forty (40) patrons," *id.* at 7887); *In re Twins Lounge, Inc.*, 50 D.C.Reg. 7902, 7904 (Sept. 19, 2003) (stating that the establishment had a "certificate of occupancy dated June 24, 2002, permitting the use of the first floor with a maximum capacity of seventy persons inside the establishment"). But that does not mean that the Board has correctly interpreted the certificates of occupan-

Nor is there any indication in the record or (as far as we have been able to tell) in regulation or case law that a number of "seats" specified on a certificate of occupancy is intended as a limit on the number of patrons that may be in an establishment at any one time. The few pertinent references in published zoning decisions suggest that a certificate of occupancy limits the number of seated customers that an establishment may have without purporting to preclude the establishment from having other patrons in standing space. *See Citizens Ass'n of Georgetown, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 337 A.2d 495, 496 (D.C.1975) (noting that the Board of Zoning Adjustment found that an establishment had a maximum seating capacity of 100 persons, but referring as well to additional customers "patronizing the carry-out" at the establishment); *In re Bd. of Zoning Adjustment Appeal No. 17439,* 54 D.C.Reg. 3359 (April 13, 2007) (discussing an establishment that had a certificate of occupancy as a 49–seat restaurant but also had floor space allocated for customer queuing and self-service for carry-out). The only evidence in the record about a limit on the total number of patrons that may lawfully occupy the establishment was Mr. Duggan's testimony, which the Board summarized in its Findings of Fact, that the establishment has a "legal capacity from the Fire Marshal for 393 patrons."[7]

The record also does not support the Board's statement that the December 4,

2002 voluntary agreement between petitioner and Advisory Neighborhood Commission 1C ("ANC 1C") and the Kalorama Citizens Association ("KCA"), which the Board approved pursuant to 23 DCMR § 1609, "indicates that the establishment's seating capacity will not exceed 99 patrons." Rather, the voluntary agreement states that the establishment's "Seating capacity will not exceed" 99 at "Interior tables and bar." And while Investigator Parker testified that there were approximately 203 patrons in Madam's Organ on April 23, 2005, he acknowledged that most of the patrons were standing and agreed that he could not "say for sure whether or not there were more than 99 folks seated in the restaurant on that evening."

In addition to relying on petitioner's license application, certificate of occupancy, and Board-approved voluntary agreement as purportedly establishing a limit on the number of patrons that may be admitted to Madam's Organ at one time, the Board emphasized in its written order that petitioner "holds and has paid for a CR01 license[,] which is for licensed restaurants with a capacity of 99 or fewer patrons." At the close of the hearing, the Board Chair made a similar comment about petitioner's license category and the fee associated with it, asserting that petitioner had "probably underpaid ... more than several thousand dollars in underpayment of fees" and that "if you have a capacity for 399, you're supposed to be paying a higher fee."[8] We have no trouble accepting the

---

cy as imposing such a limit. And, in this case, we are unpersuaded that petitioner was put on notice that the number of seats specified on its certificate of occupancy would be treated by ABRA as a limit on its number of patrons.

**7.** As the Board noted in its Findings of Fact, Mr. Duggan also testified that during the 2002 license renewal process, he had discussions with an ABRA Attorney–Advisor who agreed

that "it does not make theoretical sense that [petitioner] would be limited to 99 persons and not 99 seats."

**8.** Under current ABRA regulations, a CR licensee having a "capacity" of 99 or fewer must pay an annual fee of $1,000, while a CR licensee having a "capacity" of 200 to 499 must pay an annual fee of $1,950. 23 DCMR § 208.10 (2008).

Board's reasoning that, as a matter of policy, the higher an establishment's number of patrons, the higher the license fee should be. We can also readily accept the statement, made by ABRA's counsel at the hearing, that ABRA "want[s] to regulate the number of people drinking alcohol," whether they are standing or seated. Nevertheless, the Board's conclusion that petitioner was limited to 99 patrons at any given time does not flow logically from the fact that petitioner paid a CR01 license fee (capacity of 99 or fewer). The applicable license fees are established by 23 DCMR § 208.10, which ties a restaurant's license category and annual fee to its certificate of occupancy. Petitioner's certificate of occupancy specifies a number of *seats* (and, as discussed *supra*, we see no evidence that the certificate of occupancy purports to limit the number of *standing* patrons petitioner's establishment may have). We can agree with the Board members who concurred, at the end of the hearing, that to address the foregoing policy concerns, there is a need to "go back and revisit some definitions, particularly the definition of capacity." But these policy concerns do not provide a basis for upholding the sanctions that the Board imposed in this case when they are not supported by the license application, the certificate of occupancy, the voluntary agreement or the current regulatory use of the term "capacity."

As we have explained, the record does not support the Board's conclusion that petitioner agreed to a limit on the number of patrons that Madam's Organ could admit. The record also does not support a conclusion that the establishment made a change in the number of patrons that it admits. The Board noted Mr. Duggan's testimony that he did not believe that his certificate of occupancy for 99 seats prevented the establishment from having additional patrons standing and that "he always intended to have more than ninety-nine (99) seats due to the fact that people would be standing to use the pool tables and the second floor area." Mr. Duggan also testified, without contradiction, that over the ten years of Madam's Organ's operations, there has been "no differen[ce] whatsoever" in operations and "through the years, it's always been the same." In addition, Mr. Duggan testified that ABRA had inspected the establishment in prior years without finding an occupancy violation. The Board did not discredit Mr. Duggan's testimony, but instead accepted it as a "representation[ ] that there was some misunderstanding" as to the number of patrons permitted.[9] In light of Mr. Duggan's uncontradicted and not-discredited testimony, the record does not contain substantial evidence supporting the Board's finding that petitioner made a substantial change in its operations without Board approval.

For the foregoing reasons, we cannot sustain the Board's order sanctioning petitioner for making a substantial change in its operations by changing its occupancy without Board approval.[10] Accordingly, the Board's order is

*Reversed.*

---

9. Board Member Feather also commented that, "I really think there was some confusion in this case."

10. We need not and do not decide what action the Board may or may not take as a prospective matter. However, it is undisputed that the Board has authority to impose conditions for licensure. *See* D.C.Code § 25–

104(e) ("The Board, in issuing licenses, may require that certain conditions be met if it determines that the inclusion of the conditions will be in the best interest of the locality, section, or portion of the District where the licensed establishment is to be located."). We also note that, at the close of the hearing, the Board Chair advised petitioner that "there will be no prejudice in reviewing an immediate application to increase or request to increase the occupancy as allowed by the Board."