David MALLOF, et al., Petitioners,

v.

DISTRICT OF COLUMBIA ALCO-
HOLIC BEVERAGE CONTROL
BOARD, Respondent.

No. 10–AA–1427.

District of Columbia Court of Appeals.

Argued Oct. 4, 2011.
Decided May 17, 2012.

Michael K. Hibey for petitioners.

Richard S. Love, Senior Assistant Attorney General, with whom Irvin B. Nathan, Acting Attorney General for the District of Columbia at the time, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and John L. Davie, Special Assistant Attorney General, were on the brief, for respondent.

Before FISHER and BLACKBURNE-RIGSBY, Associate Judges, and SCHWELB, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Petitioners David Mallof and Alexis Rieffel, on behalf of A Group of Three or More Individuals ("petitioners"), seek review of a final order terminating a voluntary agreement they entered into with Leeds the Way, LLC, t/a Hank's Oyster Bar ("Hank's"). Petitioners challenge respondent District of Columbia Alcoholic Beverage Control Board's ("Board") interpretation of D.C.Code § 25–446(d)(4) (2004 Supp.), which authorizes the Board to amend or terminate a voluntary agreement once certain findings have been made. Petitioners contend that the Board failed to make two findings that are statutorily required for terminating voluntary agreements. We agree and conclude that the

Board's interpretation of the statute is contrary to the plain meaning of the statute. We vacate the Board's order granting the termination of the voluntary agreement and remand this case to the Board for additional findings not inconsistent with this opinion.

## I.

In March 2005, Hank's applied for a transfer of its initial liquor license so that it could expand its establishment to include a sidewalk café. *See* D.C.Code §§ 25–762(a) (2001) (explaining that prior to making interior or exterior changes, an establishment must obtain approval from the Board), 25–404(a) (2001) (requiring that before an establishment can make a substantial change in the nature of its operation, it must file an amendment to its license application with the Board). Petitioners and another neighborhood organization protested the transfer application, pursuant to D.C.Code § 25–601 (2007 Supp.), alleging it would disrupt the peace, order, and quiet of the neighborhood, affect traffic and parking, and increase the concentration of establishments in the area serving alcohol. On May 4, 2005, Hank's entered into a voluntary agreement with petitioners whereby petitioners agreed to withdraw their protest of Hank's transfer application in exchange for Hank's agreement to implement certain restrictions. *See id.* § 25–446(a) ("The applicant and any protestant may, at any time, negotiate a settlement and enter into a written voluntary agreement setting forth the terms of the settlement."). Among other things, Hank's agreed to limit its indoor capacity to sixty-five people and its outdoor sidewalk café capacity to twenty people; to stop serving alcohol two hours earlier than the statute requires for indoor seating, and three hours earlier for its sidewalk café; to keep noise levels down after 9:00 p.m.; and to abide by various other restrictions on its furniture storage and use of its outdoor, public space. The executed voluntary agreement was submitted to the Board for approval and on May 11, 2005, was incorporated into the Board's order approving Hank's transfer application. *See* D.C.Code § 25–446(c) (explaining that once the Board determines that the voluntary agreement complies with the applicable laws and the applicant otherwise qualifies for licensing, it must approve the establishment's license application conditioned on compliance with the voluntary agreement, and must incorporate the text of the voluntary agreement in the order approving the license application). Because the voluntary agreement had no sunset provision, neither Hank's nor petitioners could modify the voluntary agreement's terms or terminate it until the agreement was in effect for at least four years. *See id.* § 25–446(d)(1), (2).

On March 29, 2010, almost five years after entering the voluntary agreement, Hank's filed a petition with the Board for termination of the agreement. Petitioners moved to dismiss Hank's petition, claiming that Hank's failed to show it made a good faith attempt to contact or negotiate with them because Hank's did not file a signed affidavit to that effect.[1] *See* D.C.Code § 25–446(d)(4)(A) and (d)(5) (requiring an applicant seeking to terminate the agreement to contact all the parties, and to show through sworn affidavits that it at least attempted to negotiate with them). At the protest hearing on Hank's petition to terminate, the Board held that for terminations, there was no need to make a

---

1. Another neighborhood organization, DuPont Circle Citizens Association, also protested the termination of the voluntary agreement, but the organization was dismissed from the protest proceedings.

finding regarding whether Hank's made a good faith attempt to negotiate. *See id.* § 25–446(d)(4)(A)(ii). The Board denied petitioners' motion to dismiss, stating that the statute governing termination of voluntary agreements requires only a finding that a termination will not have an adverse impact on the neighborhood. *See id.* § 25–446(d)(4)(C). The Board then conducted an evidentiary hearing and limited the testimony to establishing only whether there was an adverse impact on the neighborhood. Finding no adverse impact, the Board issued its final order on November 3, 2010, granting Hank's petition to terminate the voluntary agreement and reiterating that "[Hank's] d[id] not have to satisfy § 25–446(d)(4)(A) . . . or § 25–446(d)(4)(B) in order to terminate its Voluntary Agreement."

Petitioners now seek review of the Board's final order, asserting that the Board legally erred by concluding that termination of a voluntary agreement requires only a finding that the termination would not have an adverse impact on the neighborhood under § 25–446(d)(4)(C), and does not require findings under the two antecedent provisions, § 25–446(d)(4)(A) and (B).

## II.

■ This case turns on an interpretation of D.C.Code § 25–446(d)(4), which authorizes the Board to amend or terminate a voluntary agreement under certain conditions. Whether the Board properly interpreted this statutory provision is a legal issue that we review *de novo.* *See 2461 Corp. v. District of Columbia Alcoholic Beverage Control Bd.,* 950 A.2d 50, 53 (D.C.2008). Generally, we defer to the Board's interpretation, given that it is the agency charged with administering § 25–446(d). *See 800 Water St., Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 992 A.2d 1272, 1274 (D.C.2010). However, we will not defer to the Board's

interpretation if it is plainly wrong or inconsistent with the governing statute. *Mallof v. District of Columbia Bd. of Elections & Ethics,* 1 A.3d 383, 391 (D.C.2010); *see also 1303 Clifton St., LLC v. District of Columbia,* 39 A.3d 25, 30–31, 33–35 (D.C.2012) (declining to defer to agency interpretation of its statute because the interpretation was not consistent with the purpose of the statute); *Levelle, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 924 A.2d 1030, 1035–36 (D.C. 2007) (explaining that we defer to the agency's interpretation where "the meaning of the [statutory] language is not clear on its face; however, the judiciary is the final authority on issues of statutory construction") (citation and internal quotations marks omitted).

■ We begin our analysis by examining whether the statutory language of § 25–446(d)(4) is clear. *See Hospitality Temps Corp. v. District of Columbia,* 926 A.2d 131, 136 (D.C.2007) ("The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning.") (citation and internal quotation marks omitted); *Bates v. District of Columbia Bd. of Elections & Ethics,* 625 A.2d 891, 893 (D.C.1993) (explaining that prior to deferring to an agency's interpretation of a statute, we must first determine whether the meaning of the statute is clear, because if the language is clear, no deference is due to the agency's interpretation); *James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989) ("In interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning."). The Board asserts that § 25–446(d)(4) requires the Board to make only one finding in order to approve a termi-

nation of a voluntary agreement; however, the statutory provision at issue states:

> (4) The Board may approve a request by fewer than all parties to amend or terminate a voluntary agreement for good cause shown *if it makes each of the following findings* based upon sworn evidence:
>
>> (A)(i) The applicant seeking the amendment has made a diligent effort to locate all other parties to the voluntary agreement; or
>>
>>> (ii) If non-applicant parties are located, the applicant has made a good-faith attempt to negotiate a mutually acceptable amendment to the voluntary agreement;
>>
>> (B) The need for an amendment is either caused by circumstances beyond the control of the applicant or is due to a change in the neighborhood where the applicant's establishment is located; and
>>
>> (C) The amendment or termination will not have an adverse impact on the neighborhood where the establishment is located as determined under § 25–313 or § 25–314, if applicable.

D.C.Code § 25–446(d)(4) (emphasis added). The language of the initial paragraph of the provision states that to terminate a voluntary agreement, *each* of the enumerated *findings* (plural) that follow the initial paragraph must be made. Then, in subparagraphs § 25–446(d)(4)(A), (B), and (C), respectively, the statute lists the three requisite findings. The clear import of these words and the statutory structure is that all three findings must be made. *See Boyle v. Giral,* 820 A.2d 561, 568 (D.C. 2003) ("We look to the plain meaning of a statute first, construing words according to their ordinary meaning."); *Sch. St. Assocs. Ltd. P'ship v. District of Columbia,* 764 A.2d 798, 805 (D.C.2001) (en banc) ("[T]he language of the statute must control its application."); 2A Norman J. Singer &

J.D. Shambie Singer, *Sutherland Statutes & Statutory Construction,* § 46:1 (7th ed.2007) [hereinafter *Sutherland* ] ("[W]hen the language of the statute is clear and not unreasonable or illogical in its operation, the court may not go outside the statute to give it a different meaning.").

The Board argues that because subparagraphs (A), (B), and (C) mention amendments to voluntary agreements, while only subparagraph (C) mentions termination of voluntary agreements, the Board is required to make all three findings, in subparagraphs (A), (B), and (C), for amendments, but only the last finding, in subparagraph (C), for terminations. We are not persuaded by the Board's reading of the statute. The Board contends that the statutory language is not "plain" or "clear" and does not lend itself to one interpretation, as the petitioners argue, because although the initial paragraph of § 25–446(d)(4) mentions the findings necessary for terminations *and* amendments, subparagraphs (A), (B), and (C) make a distinction between the two, creating a "tension with the introductory clause's use of the word 'each.'" Contrary to the Board's assertions, the plain language of paragraph § 25–446(d)(4) and subparagraphs (A), (B), and (C) is not irreconcilable. *See Baghini v. District of Columbia Dep't of Emp't Servs.,* 525 A.2d 1027, 1029 (D.C.1987) (interpreting a statute based on its plain language and reading seemingly inconsistent subsections in such a way to avoid conflict between the subsections). The first two findings the Board is required to make relate to making efforts to amend the voluntary agreement. *See* D.C.Code § 25–446(d)(4)(A) (party seeking to amend must make efforts to reach and negotiate with other party); § 25–446(d)(4)(B) (amendment must be necessitated by changed circumstances arising since parties first entered

the voluntary agreement). The final finding the Board is required to make relates to the impact the amendment or termination of the voluntary agreement would have on the neighborhood. *See* D.C.Code § 25–446(d)(4)(C). Petitioners argue, and we agree, that subparagraphs (A) and (B) mention "amendment" and not "termination" because prior to approving a termination of a voluntary agreement, the Board must first consider whether amending the voluntary agreement is feasible. In other words, parties must first attempt to contact and meet with each other to negotiate an amendment to the voluntary agreement, *see id.* § 25–446(d)(4)(A), and show that there is a need for an amendment to the voluntary agreement, *see id.* § 25–446(d)(4)(B), before they can terminate the agreement completely based on a finding that there will be no adverse impact on the neighborhood, under § 25–446(d)(4)(C).

This reading of the statute is persuasive considering that it gives every word of § 25–446(d)(4) its ordinary meaning. The Board's interpretation disregards the meaning of the word "each" in the initial paragraph of § 25–446(d)(4), which is contrary to the notion that "effect must be given every word of a statute, and interpretations that operate to render a word inoperative should be avoided." *1137 19th St. Assocs., Ltd. P'ship v. District of Columbia,* 769 A.2d 155, 161 (D.C.2001) (cita-

tion and internal quotation marks and brackets omitted); *see also Mulky v. United States,* 451 A.2d 855, 856–58 (D.C.1982) (rejecting a statutory interpretation that would compel the court to read an entire phrase out of the statute). The Board's interpretation reads the word "each" as meaning only "one," such that the Board need only satisfy subparagraph (C) before approving a petition to terminate a voluntary agreement. However, by definition, the initial paragraph's use of the word "each" cannot be read to mean only the last factor, as the Board contends. Instead, the plain meaning of "each" means "every one" of the enumerated factors in subparagraphs (A), (B), and (C), separately considered.[2] *See Oglesby, supra* note 2, 832 P.2d at 840. By reading the word "each" to refer to subparagraphs (A), (B), and (C), rather than just subparagraph (C), for both amendments and terminations, we apply the ordinary meaning of the word "each" in the statute and "give force to and preserve all the words of the statute." *Sutherland, supra,* § 46:6.

Furthermore, interpreting § 25–446(d)(4) to require the Board to make all three findings in subparagraphs (A), (B), and (C), rather than focusing only on the last finding in subparagraph (C), makes sense when viewed in light of the statutory scheme governing voluntary agreements. Voluntary agreements were intended to be

---

**2.** The Board's reading is contrary to the clear meaning of the word "each," which indicates reference to "two or more" items, objects, individuals, choices, or entities. *See* MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 390 (11th ed.2005) ("being one of *two or more* distinct individuals having a similar relation and often constituting an aggregate") (emphasis added); *see also 1618 Twenty–First St. Tenants' Ass'n v. The Phillips Collection,* 829 A.2d 201, 203 (D.C.2003) (use of dictionary definitions is appropriate in interpreting undefined statutory terms). Other jurisdictions have also defined the word "each" to

mean more than one. *See Oglesby v. Liberty Mut. Ins. Co.,* 832 P.2d 834, 840 (Okla.1992) (noting that "each" functions as a "distributive adjective pronoun denoting or referring to every one of two or more persons or things, composing the whole, separately considered"); *Sherley v. Johnson,* 38 So.2d 121, 121 (Fla.1948) (en banc) ("'[E]ach' is a distributive adjective pronoun."); *McLaughlin v. McLaughlin,* 89 A. 520, 521 (N.J.Ch.1914) ("'[T]he word 'each' is generally defined to mean any one of any number, separately considered.").

permanent, rather than easy to amend or terminate. *See* D.C.Code § 25–446(d)(1) (stating that voluntary agreements remain in effect indefinitely, and run with the length of the license, including renewal periods, unless certain exceptions apply). However, the statute contemplated that voluntary agreements could be amended or terminated if all the parties agree. *See id.* (allowing parties to amend or terminate a voluntary agreement where the parties negotiated a sunset provision into the voluntary agreement or where the parties agree in writing to terminate or amend the voluntary agreement). Section § 25–446(d)(4) addresses a stalemate situation in which some of the parties to the voluntary agreement are willing to agree to terminate or amend the agreement under § 25–446(d)(1), but "fewer than *all* the parties"[3] to the voluntary agreement are willing to participate and agree to amend or terminate it. Section 25–446(d)(4) allows the Board to step in and decide whether a termination or amendment of the voluntary agreement is necessary when a party is unreachable or refuses to participate. However, before the Board can intervene on the basis that parties are unreachable or unwilling to agree to an amendment, the Board must make findings that (1) diligent efforts were made to contact all parties to the agreement and to negotiate an amendment in good faith, (2) there is a need for the change or termination, and (3) the neighborhood would not suffer any adverse impact as a result. *See* D.C.Code § 25–446(d)(4)(A)–(C). Interpreting the statute to require all three findings prior to terminating a voluntary agreement comports with the statutory scheme governing voluntary agreements, allowing parties to amend or end the agreement even if one or two parties are unwilling or are legitimately unable to participate in negotiating an amendment to the voluntary agreement.

Moreover, the Board's interpretation led to a problematic outcome. Both Hank's and petitioners gave up rights and gained benefits by entering into the voluntary agreement. By agreeing to the voluntary agreement, Hank's was able to avoid a lengthy and contentious transfer application process—which requires giving neighborhood organizations notice and a period within which to protest the change to its operation, and requires the Board to hold a protest hearing—in exchange for agreeing to restrict its business operations regarding the sale of alcoholic beverages. Likewise, petitioners gave up their right to protest Hank's application and to have a hearing regarding the propriety of expanding Hank's capacity to sell liquor in their neighborhood in exchange for a reduced number of patrons and a more limited time-frame during which alcohol would be served. Terminating this *voluntary* agreement—negotiated so that each party gained benefits and relinquished rights—without first attempting to salvage the agreement by amending it, was unfair. This is especially true since doing so would result in Hank's having the full benefit of being able to extend its hours and increase the number of people to which it can serve alcohol, while petitioners have completely relinquished their rights to protest the license and have their voices heard at a hearing. *See* D.C.Code § 25 602(a) (2001) (limiting time to object to the approval of an application for a substantial change in operation to "within the protest period");

---

**3.** Voluntary agreements frequently have several parties, as illustrated by the six signatories that signed the voluntary agreement at issue in this case. Over the length of the voluntary agreement, it is not unlikely that some parties may pass away, move without providing forwarding contact information, or become otherwise unreachable. Thus, a provision allowing fewer than all the parties to amend or terminate the agreement strikes us as a reasonable response to a foreseeable situation.

23 DCMR § 1601.3 (2008) ("An objection must be received by the Board prior to the end of the protest period to be considered timely filed."), 23 DCMR § 1606.1 (2008) (entitling persons who timely object to an establishment's licensing to a "protest hearing"). It is contrary to the statutory purpose to give one party to a voluntary agreement the full benefit of their bargain, and strip the other party of all its rights on a showing solely that the neighborhood would not be adversely impacted. *See* D.C.Code § 25–446(d)(4)(C).

In addition, the Board's interpretation is undeserving of deference because it allows one party to unilaterally terminate a voluntary agreement without first contacting the other party to the agreement and without trying to negotiate a less drastic solution by first amending the agreement. The result is that the party not seeking the termination can have its bargained-for rights forfeited without notice and an opportunity to reach a less drastic outcome. Further, unilateral termination of voluntary agreements without first requiring some attempt to amend the agreement raises an additional concern, because the statute clearly intended that voluntary agreements, once entered into, would run the length of the license, unless *the parties themselves* negotiated a sunset provision to the agreement or agreed in writing to terminate it. *See* D.C.Code § 25–446(d)(1) ("Unless a shorter term is agreed upon by the parties, a voluntary agreement shall run for the term of a license, including renewal periods, unless it is terminated or amended in writing by the parties and the termination or amendment is approved by the Board."). We decline to read the statute to give the Board power to allow one party to a voluntary agreement to terminate the agreement with no involvement from *any* of the other parties to the agreement, when the statute expresses a contrary intent, which is that voluntary agreements should continue during the life of

the license unless some of the parties themselves agree otherwise, or at a minimum, attempt in good faith to do so.

Furthermore, it strikes us as unreasonable that terminations of a voluntary agreement should be easier to effectuate than an amendment of the agreement. The Board's interpretation would compel us to read the statute as requiring fewer findings to achieve a more extreme outcome—termination of a voluntary agreement—than would be required to achieve an amendment of a voluntary agreement. Interpreting the statute as requiring a lower threshold for terminations than for amendments has an unfair impact on neighborhood organizations and creates a perverse incentive for establishments to terminate rather than amend agreements they voluntarily entered into. Such an incentive undermines the purpose of voluntary agreements. *See Grayson v. AT & T Corp.*, 15 A.3d 219, 238 (D.C.2011) ("[W]e eschew interpretations that lead to unreasonable results.") (footnote and internal quotation marks omitted); *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983) (en banc) ("[W]henever possible, the words of a statute are to be construed to avoid obvious injustice.") (citation and internal quotation marks omitted).

We finally note that the Board's own prior practice in applying § 25–446(d)(4) mirrors the interpretation we adopt here. In the Board's first contested protest hearing challenging a proposed termination of a voluntary agreement, the Board made findings on all three factors in considering whether to approve a termination of a voluntary agreement. Board Order, NHV Corp., Inc. t/a Haydee's Rest., No. 2008–189 at 19 (Alcoholic Beverage Control Bd. Apr. 23, 2008); *see also* Board Order, Jamie T. Carrillo t/a Don Jaime's Rest., No. 2008–190 at 20 (Alcoholic Beverage Con-

trol Bd. Apr. 23, 2008) (making findings on all three factors). Petitioners' protest hearing marks the first time the Board departed from this practice. The Board acknowledged this departure from previous practice (not in Hank's order, but in an order the Board issued subsequent to this case), reasoning that the departure was warranted due to public policy and the Board's duty "to apply the law as written." *See* Board Order, NHV Corporation, Inc., t/a Haydee's Restaurant, No. 2011–151 (Alcoholic Beverage Control Bd. Mar. 9, 2011) (explaining that the Board "is aware that it previously applied [all three factors] to petitions to terminate voluntary agreements"). The fact that the Board has departed from its prior interpretation further persuades us not to defer to its new interpretation. *See Coumaris v. District of Columbia Alcoholic Beverage Control Bd.*, 660 A.2d 896, 900 (D.C.1995) (explaining that deference is more appropriate where the interpretation is one of "long standing"); *see also Holzsager v. District of Columbia Alcoholic Beverage Control Bd.*, 979 A.2d 52, 63 (D.C.2009) (noting that where the Board waited more than two years after a bill was passed before it determined the requirements of the Act, deference to the Board's interpretation was "somewhat undermine[d]"). While we do not advocate an agency's dogmatic adherence to an incorrect statutory interpretation simply because it has held that interpretation for a long time, *see Zuber v. Allen*, 131 U.S.App.D.C. 109, 119–20, 402 F.2d 660, 670–71 (1968), we find the Board's prior interpretation more reasonable since it comports with the plain meaning of the statutory language and gives meaning to the statutory provision when read as a whole.[4] *See Baghini, supra,* 525 A.2d at 1029 ("In construing the two subsections at issue here, we must at the same time give effect to the whole statute in light of its underlying objectives.").

## III.

We are satisfied that the plain meaning of § 25–446(d)(4) requires the Board to make the three findings specified in subparagraphs (A)-(C) before it may approve termination of a voluntary agreement, and we decline to defer to the Board's contrary interpretation. Because the Board only made findings as to subparagraph (C), on remand, the Board must make findings regarding subparagraphs (A) and (B). Accordingly, we vacate the order granting Hank's petition to terminate the voluntary agreement and remand this case to the Board for further proceedings not inconsistent with this opinion.

*Vacated and remanded.*

---

4. Although we may also look to the legislative history to determine the proper interpretation of a statute, we need not (and should not) do so where the language of the statute is unambiguous and plain, as it is here. *See Hood v. United States*, 28 A.3d 553, 559 (D.C.2011) ("[R]esort to legislative history to construe a statute is generally unnecessary (if not, indeed, disfavored); usually it is appropriate only to resolve a genuine ambiguity or a claim that the 'plain meaning' leads to a result that would be absurd, unreasonable, or contrary to the clear purpose of the legislation."); *Dobyns v. United States*, 30 A.3d 155, 159 (D.C. 2011) (enumerating four instances when courts may look beyond plain meaning of a statute, none of which apply here). Even if we did consider the legislative history, we note that the legislative record proves unhelpful because it is silent regarding whether termination and amendment of a voluntary agreement should be treated similarly. *See Grayson, supra,* 15 A.3d at 237–38 ("[S]hould effort be made to broaden the meaning of statutory language by mere inference or surmise or speculation, we might well defeat true [legislative] intent.") (citation and internal quotation mark omitted). Moreover, no reasonable inferences can be gleaned from this legislative silence.

SCHWELB, Senior Judge, concurring in the judgment:

I agree with my colleagues in the majority that the Board is not authorized to terminate the voluntary agreement without first making the findings specified in subsections (A) and (B) of D.C.Code § 25–446(d)(4), as well as the finding in subsection (C). Accordingly, I concur in the reversal of the Board's order. I write separately, however, because I find the issue substantially more difficult than my colleagues do.

In its opinion, the majority refers repeatedly to the "plain language" and the "plain meaning" of the statute, and relies on decisions in which the statutory language was altogether unambiguous. My colleagues even assert, see maj. op., *ante*, at 923 n. 4, that the meaning of the statute before us is so plain that resort to legislative history would be inappropriate. I cannot agree with this assessment.[5] Indeed, "even when a statute appears to be clear on its face, a review of the legislative history may reveal a latent ambiguity which the court must resolve." *Baghini v. District of Columbia Dep't of Emp't Servs.*, 525 A.2d 1027, 1029 (D.C.1987) (citing *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983) (en banc)). Here, in my view, the ambiguity is clear, not latent.

In its brief in this court, the Board, after quoting § 25–446(d), see maj. op., *ante*, at pp. 918–19, argues, in pertinent part, as follows:

The Board's resolution of [the issue] was at minimum reasonable. The Council's choice to refer to amendments but not termination in subsections (A) and (B) should be presumed deliberate: *"Expressio unius est exclusio alterius." See, e.g., Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 994 A.2d 375, 377–78 (D.C.2010). Although the resulting interpretation is in tension with the introductory clause's use of the word "each," a reasonable interpretation of the statute as a whole is that the Council intended to require the Board to make "each of the following findings" under the succeeding subsections to the extent those subsections required findings.

It is not at all "clear" or "obvious" to me that this analysis of the provisions of § 25–446(d)(4) is erroneous. Rather, it strikes me as being one of two plausible (as distinguished from plainly correct) interpretations of the statute, and it takes into consideration the fact that while subsection (C) addresses "amendment or termination" of a voluntary agreement, subsections (A) and (B) deal with "amendment" only. In my opinion, therefore, the statutory language is not as "plain" or as "clear" as the majority (or, indeed, the Board in its decision) says it is. Reasonable people could read it either way.

We accord "considerable deference" to the Board's interpretation of statutes it is charged with administering. *800 Water St., Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 992 A.2d 1272, 1274 (D.C.2010). At first blush, one might be tempted, in light of what I perceive to be two plausible constructions, to accord such deference here. But as the Board acknowledges in its brief:

In three prior decisions, the Board admittedly has stated that a licensee must satisfy all three criteria in D.C.Code § 25–446(d)(4) to terminate a voluntary agreement. *See In the Matter of NHV Corporation, Inc.; t/a Haydee's Restaurant*, Case No. 10515–07/065P, Order

---

**5.** By contrast, in its decision in this case, the Board asserts that its contrary interpretation is supported by the plain language of the statute. Plainness, like beauty, is apparently in the eye of the beholder.

No.2008–189; *In the Matter of Jamie T. Carrillo t/a Don Jaime's Restaurant,* Case No. 10579–07/53P, Order No.2008–190; *In the Matter of Don Juan Restaurant, Inc. t/a Don Juan Restaurant & Carryout,* Case No. 21278–07/042P, Order No.2008–233. It is also true that the Board did not mention these decisions in the decision at issue in this appeal.

(Footnote omitted.) We have repeatedly held that "[t]he deference which courts owe to agency interpretation of statutes which they administer is, of course, at its zenith where the administrative construction has been consistent and of long standing, *and plummets substantially when those attributes are lacking.*" *Tenants of 738 Longfellow St., N.W. v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 1205, 1213 (D.C.1990) (emphasis added); *accord, Superior Beverages, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 567 A.2d 1319, 1325 (D.C.1989). Under these circumstances, and mindful of the phrase "plummets substantially," I am not prepared to accord the Board's interpretation dispositive weight here.

That being said, I think that, all things considered, the petitioners have the better of the argument. The Board acknowledges, as I have noted, that its construction of the statute is "in tension with the introductory clause's use of the word 'each.'" If we were to adopt the Board's interpretation, the party seeking termination would not be required to present evidence to support *each* of the three findings, apparently contemplated in the introductory clause. While not dispositive, the use of the word "each" is the most significant indication in the text of the legislature's intent. Further, for the reasons stated by the majority, it is counter-intui-tive and arguably unfair [6] for the parties to an agreement to be entitled to notice, and to an opportunity to negotiate, when the lesser relief of an amendment is at issue, but not when the more drastic remedy of termination is sought. Indeed, except for the court's insistence that the statute is clear and unambiguous—and this is an important proviso—I generally agree with the majority's principal conclusions. Accordingly, I concur in the judgment.

---

**6.** Any injustice is tempered, however, by the fact that if the Board grants the request to terminate the agreement, the petitioners would have the right to protest and oppose the renewal of the license upon its termination.