**Alan GOTTLIEB, et al., Appellants,**

**v.**

**FEDERAL ELECTION COMMISSION,**
**Appellee.**

**No. 97–5125.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 3, 1998.

Decided May 22, 1998.

Harold Richard Mayberry, Jr. argued the cause and filed the briefs for appellants.

David Kolker, Attorney, Federal Election Commission, Washington, DC, argued the cause for appellee. With him on the brief were Lawrence M. Noble, General Counsel, and Richard B. Bader, Associate General Counsel, Washington, DC.

Before: SILBERMAN, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This is an appeal from the judgment of the district court dismissing for lack of standing a suit brought by four individuals and three organizations. *See Gottlieb v. FEC,* No. 95–1923 (D.D.C. May 8, 1997). The suit alleged that the Federal Election Commission's dismissal of an administrative complaint filed by these appellants was "contrary to law," 2 U.S.C. § 437g(a)(8)(C).

The individual appellants are Alan Gottlieb, Michael A. Siegel, Todd Herman, and Joseph P. Tartaro, all registered voters who supported candidates opposing William J. Clinton in the 1992 presidential election. The organizational appellants are the Center for the Defense of Free Enterprise and the Second Amendment Foundation, both tax-exempt organizations who promote free enterprise or the right to bear arms, and the American Political Action Committee ("AmeriPAC"), a multicandidate political action committee which spent about $6,600 opposing the election of President Clinton in the 1992 general election.

The administrative complaint, filed on March 9, 1995, charged that President Clinton's 1992 primary campaign committee violated the Presidential Primary Matching Payment Account Act and Commission regulations. The alleged violation dealt with the transfer of contributions earmarked for the primary campaign into the General Election Legal and Accounting Compliance Fund. The Commission dismissed the complaint on August 16, 1995, after three of the six Commission members found no violation.

The Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042, provides federal funds "matching" individual private campaign donations of $250 or less, up to an overall ceiling. *Id.* § 9034. The Act subsidizes only the primary campaign, not the costs of campaigning in the general election. Although candidates technically are "ineligible" to receive matching funds after the primary election, *id.* § 9033(c)(1)(A) & § 9032(2), they may continue to receive such funds to offset "net outstanding campaign obligations" accrued during the primary. 11 C.F.R. § 9034.1(b). "Net outstanding campaign obligations" are essentially "the amount of [the] campaign's qualified obligations *as of the date of ineligibility* less the value of its assets on that date." *LaRouche v. FEC,* 28 F.3d 137, 139 (D.C.Cir.1994) (emphasis added). The Commission's implementing regulations permit a candidate to receive matching funds only if "the sum of the contributions received on or after the date of ineligibility plus matching funds received on or after the date of ineligibility is less than the candidate's net outstanding campaign obligations." 11 C.F.R. § 9034.1(b). Each private contribution diminishes the total amount of primary campaign debt, and consequently the total amount of matching funds a candidate is permitted to receive. To enforce this re-

quirement, the Commission requires the candidate to submit a statement of net outstanding campaign obligations within fifteen days after his nomination; with each new request for matching funds after the nomination the candidate must submit a revised statement of such obligations. 11 C.F.R. § 9034.5(a) & (f)(1).

Appellants contend that after President Clinton received the Democratic Party's nomination, his campaign transferred $1.4 million in private contributions to the Clinton–Gore '92 General Election Legal and Accounting Compliance Fund ("Compliance Fund"), instead of using that money to offset its outstanding primary campaign debts. According to appellants, this violated 11 C.F.R. § 9003.3(a)(1) (1994),[1] which permits only transfers of funds "in excess of any amount needed to pay remaining primary expenses...." Appellants further charged that in reporting later private contributions to the Commission, the Clinton campaign did not record the contributions it had transferred to the Compliance Fund. As a result, the primary campaign received $1.4 million more in matching funds than it was entitled.

Under the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431–455, "[a]ny person" who believes that the Act has been violated may file a complaint with the Commission. Id. § 437g(a)(1). Complaints are investigated only if four of the six Commissioners vote that there is "reason to believe" a violation has occurred. Id. § 437g(a)(2). After conducting an investigation, the Commission votes again on whether there is "probable cause" to believe the law has been violated. Id. § 437g(a)(4)(A)(i). Here, the Commission agreed to investigate, but ultimately dismissed the complaint after three of the six Commissioners found no violation.

Appellants' suit in the district court, filed under 2 U.S.C. § 437g(a)(8)(A), sought an order declaring the Commission's dismissal of the administrative complaint contrary to law and an order directing the Commission to conform its conduct to the declaration within 30 days. The only question before us is whether the district court properly dismissed the suit for lack of standing. That is, have appellants suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; is their injury "fairly ... trace[able]" to the challenged action; and is the injury "likely" to be redressed by a favorable decision of the court? *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted).

Appellants identify three separate injuries stemming from the Clinton primary campaign's transfer of contributions into the Compliance Fund: AmeriPAC suffered "competitive injury"; the voters not only suffered a diminution in their ability to influence the political process but also the candidates they supported were put at a disadvantage.[2]

As to AmeriPAC's "political competitor" theory, we have never completely resolved this "thorny issue." *Common Cause v. FEC,* 108 F.3d 413, 419 n. 1 (D.C.Cir.1997); *Akins v. FEC,* 101 F.3d 731, 737 (D.C.Cir. 1997) (en banc), *cert. granted,* — U.S. —, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997); *Fulani v. Brady,* 935 F.2d 1324 (D.C.Cir.1991). AmeriPAC thinks our opinion in *Fulani*—a case in which we concluded the appellant *lacked* standing to sue the Internal Revenue Service—supports its position. We think the opposite. *Fulani,* a minor party candidate in the 1988 Presidential election, sought to invalidate the tax-exempt status of the sponsor of the Presidential debates, which had excluded her from participating. We rejected Fulani's contention that she had "competitor standing" to bring suit: She was not in a position to be granted tax-exempt status, and thus was not in competition for that benefit. *See Fulani,* 935 F.2d 1324; *but see Fulani v. League of Women Voters Educ. Fund,* 882

---

1. This regulation has since been amended. We cite to the regulation in place at the time of the alleged violation.

2. In their complaint, appellants also allege "informational injury" and injury to their First Amendment interests. Because they have not made these claims in their appellate briefs, we do not address them.

F.2d 621 (2d Cir.1989). We speculated that "[a]rguably" Fulani would have had standing "if the IRS were depriving Fulani of a benefit that it afforded to others similarly placed...." *Fulani*, 935 F.2d at 1328.

AmeriPAC's "competitor standing" argument suffers the same flaw. Like Fulani, the organization challenges a government benefit granted to a third party. AmeriPAC cannot claim standing as a "competitor" of the Clinton campaign because it was never in a position to receive matching funds itself. Only another candidate could make such a claim. Our conclusion is consistent with the line of cases granting standing to economic competitors. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987); *Investment Co. Inst. v. Camp*, 401 U.S. 617, 620, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971); *Arnold, Tours, Inc. v. Camp*, 400 U.S. 45, 46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970); *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Those decisions also require that the plaintiff "show that he personally competes in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit." *In re United States Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir.1989). For "[o]nly then does the plaintiff satisfy the rule that he was personally disadvantaged." *Id.*

■ As to the four voters, the supposed injury to their "ability to influence the political process" rests on gross speculation and is far too fanciful to merit treatment as an "injury in fact." *See, e.g., Kardules v. City of Columbus*, 95 F.3d 1335, 1348–53 (6th Cir. 1996). In a case such as this one, where the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing will often be difficult to establish. *Lujan*, 504 U.S. at 562, 112 S.Ct. at 2137. This is because "one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989)). The individual appellants say their support for rival candidates was rendered less effective because the Clinton campaign had greater funds with which to sway voters. That conclusion rests on a series of hypothetical occurrences, none of which appellants can demonstrate came to pass.

For instance, appellants suppose that as a result of the allegedly illegal transfer of contributions into the Compliance Fund, the Clinton primary campaign received $1.4 million more in matching payments from the federal government than it was entitled. But the matching payments at issue—received *after* Clinton became the Democratic nominee—went to retire the primary campaign's outstanding debt. None of those funds were employed in a manner that would have diminished the voters' influence over the general election. Nor did the transfer to the Compliance Fund directly infuse the Clinton–Gore general election campaign with funds with which to influence public opinion in Clinton's favor. The Compliance Fund pays for the legal and accounting services required for compliance with campaign finance laws. Commission regulations prohibit use of those funds for electioneering activity, *see* 11 C.F.R. § 9003.3(a)(2), and appellants do not contend that this rule was violated.

Appellants also think the transfer into the Compliance Fund allowed the Clinton campaign to funnel more of its postprimary contributions directly into campaigning. That is not necessarily so. Had the transfer never occurred, the Compliance Fund might simply have made do with less, or contributors might have been willing to give more. Either way, the total amount of funds available for electioneering then would have remained the same. Even if the transfer enriched the Clinton–Gore campaign, appellants have not suggested how this money was used to influence public opinion. For all we know, any excess funds could have been used for better hotel accommodations, more comfortable transportation, or brightening up the decor at campaign headquarters—purposes which at least arguably did not directly counter or even diminish appellants' attempts to influ-

ence the electorate. And under any circumstances, it is unclear how their influence as *voters* was diminished. The Clinton campaign may have received extra funds, but this did not prevent the voters from engaging in any of the numerous activities open to all politically active citizens. They were free to raise funds to support their own candidates, volunteer their time to work on those campaigns, and vote for the candidate of their choice.

■ The individual voters attempt to tie their supposed injury to that suffered by candidates opposing Clinton in the 1992 campaign. They believe that a competing candidate "clearly" would have standing under these circumstances. Therefore, voters have standing to seek relief against "unfair treatment" burdening these candidates. They cite decisions recognizing that, in some circumstances, the interests of candidates and voters are so intertwined that an injury to the candidate causes correlative harm to voters. *E.g., Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972); *Duke v. Cleland*, 5 F.3d 1399, 1403 n. 2 (11th Cir. 1993); *Erum v. Cayetano*, 881 F.2d 689, 691 (9th Cir.1989), *overruled on other grounds by Lightfoot v. Eu*, 964 F.2d 865 (9th Cir.1992); *Thorsted v. Gregoire*, 841 F.Supp. 1068, 1073 (W.D.Wash.1994), *aff'd on other grounds sub nom. Thorsted v. Munro*, 75 F.3d 454 (9th Cir.1996); *Williams v. Adams County Bd. of Election Comm'rs*, 608 F.Supp. 599, 600 (S.D.Miss.1985).

Appellants' argument goes nowhere. The cases recognizing a link between harm to candidates and a derivative harm to voters also require that the voters have themselves suffered a concrete and personalized injury. Such injury arises when the candidate is prevented from appearing on a ballot altogether, as when the state charges a prohibitively high filing fee to run in a primary election (as in *Bullock*), or when the filing deadline is set unrealistically early (as in *Anderson*). Ballot eligibility requirements and term limits also prevent candidates from appearing on the ballot, directly impinging on the voters' ability to support that candi-

date. *See Thorsted*, 841 F.Supp. at 1073. We do not necessarily have to agree with all of these decisions. It is enough to point out here that the analogy appellants wish to draw fails. The extra infusion of funds into the Clinton campaign did not impede the voters from supporting the candidate of their choice. *See Buckley v. Valeo*, 424 U.S. 1, 94, 96 S.Ct. 612, 670–71, 46 L.Ed.2d 659 (1976) ("denial of public financing to some Presidential candidates is not restrictive of voters' rights").

Appellants also invoke our decision in *International Association of Machinists & Aerospace Workers v. FEC*, 678 F.2d 1092 (D.C.Cir.) (en banc), *aff'd mem.*, 459 U.S. 983, 103 S.Ct. 335, 74 L.Ed.2d 379 (1982). We do not understand why. The case did not concern the diminution of individual voters' influence on an election. We made this plain: The plaintiffs brought suit "as Union members, as corporate shareholders, and on behalf of corporate employees, *not as voters.*" 678 F.2d at 1098 (emphasis added). They challenged laws permitting corporate PACs to solicit funds from executive and administrative employees. We held that the union's influence had been diminished "relative" to the corporate PACs, creating the type of competitive injury described earlier in this opinion. *Id.* Nowhere does our en banc opinion mention the sort of injury the individual voters allege here.

Although at the complaint stage of the proceedings appellants needed only to make "general factual allegations of injury," *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136–37, they have not managed to meet even this low threshold. The speculative, amorphous claims of injury they have put forward do not satisfy Article III's "case" or "controversy" requirement.

*Affirmed.*