**David J. MALLOF, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, Respondent.**

**No. 09–AA–182.**

District of Columbia Court of Appeals.

Argued Sept. 30, 2009.

Decided Aug. 5, 2010.

Amanda Hine, with whom Marcia T. Maack and Arthur B. Spitzer, Washington, DC, were on the brief, for petitioner.

Terri D. Stroud, with whom Kenneth J. McGhie was on the brief, for respondent.

Before GLICKMAN and FISHER, Associate Judges, and FARRELL, Senior Judge.

GLICKMAN, Associate Judge:

Petitioners David J. Mallof, Elizabeth B. Elliott, and John D. Hanrahan live and vote in Ward 2 of the District of Columbia. They complained to the Office of Campaign Finance in the Board of Elections and Ethics that a candidate running for the Ward 2 seat on the Council of the District of Columbia had violated the city's campaign finance law by using District government resources to support his campaign. The Office of Campaign Finance investigated the complaint and found no violation. Petitioners asked the Board to review that determination, but the Board concluded they lacked standing because they were not "adversely affected" by the decision. Petitioners now ask us to reverse the Board and remand for it to consider their complaint on its merits. We decline to do so, for we agree with the Board that petitioners lacked standing to obtain the review they sought.

## I. The Regulatory Framework

The campaign finance laws of the District of Columbia are codified in Chapter 11 of Title 1 of the District of Columbia Code.[1] Section 1–1106.51(a) prohibits the use of District government resources for campaign-related activities. In pertinent part, the statute provides that "[n]o resources of the District of Columbia government, including, the expenditure of funds, the personal services of employees during their hours of work, and nonpersonal services, including supplies, materials, equipment, office space, facilities, telephones and other utilities, shall be used to support or oppose any candidate for elected office...."[2] Subsection (b)(2) of the same statute makes clear that its prohibitions apply to "any member of the staff of the Mayor, the Chairman and members of the Council, or the President and members of the Board of Education, or any other employee of the executive or legislative branch."[3]

Responsibility for investigating alleged violations of Section 1–1106.51 and other campaign finance law provisions is vested

1. D.C.Code §§ 1–1101.01 to 1–1151.06 (2001 & Supp. 2010).

2. *Id.* § 1–1106.51(a).

3. *Id.* § 1–1106.51(b)(2).

in the Director of the Office of Campaign Finance ("OCF") in the Board of Elections and Ethics.[4] Under regulations promulgated by the Board, a "preliminary" OCF investigation may be initiated either internally or on a complaint "by any employee or resident of the District of Columbia."[5] The preliminary investigation, to be completed within twenty days,[6] enables the Director of OCF to determine whether to open a "full" investigation based on "reasonable cause" to believe that a campaign finance violation has occurred.[7] If so, the Director must notify the subject of the investigation in writing and offer him or her "an opportunity to respond to the allegations."[8] In a full investigation, the Director is authorized to gather evidence by subpoena, depositions, and other appropriate means.[9]

If the full OCF investigation develops "sufficient evidence" of a campaign finance violation, the Director "shall institute" an action before the Board and present evidence of the violation in "an adversary and open hearing."[10] The hearing is a contested case proceeding subject to the requirements of the District of Columbia Administrative Procedure Act.[11] OCF "has the burden of proving a violation with reliable, probative and substantial evidence."[12] If the Board finds a campaign finance law violation, it may assess a civil monetary penalty[13] or seek declaratory or injunctive relief in Superior Court, and it also may refer the violation to the United States Attorney for criminal prosecution.[14]

On the other hand, if OCF's full investigation finds "insufficient evidence" of a campaign finance law violation, the Director may dismiss the case.[15] The Director must report any such dismissal to the Board "by order with written findings of facts and conclusions of law."[16] Any "party" to the investigation (a term not defined in the regulations) who is "adversely affected" by the dismissal order may obtain review of the order by filing a request for a *de novo* hearing with the Board.[17] As in an adversary action against the alleged violator commenced by the Director, the hearing before the Board would be a contested case proceeding subject to

---

4. *See* D.C.Code § 1–1103.02(c) ("All investigations of alleged violations of this chapter shall be made by the Director [of OCF] in his or her discretion, in accordance with procedures of general applicability issued by the Director in accordance with the District of Columbia Administrative Procedure Act (§ 2–501 *et seq.*). All allegations of violations of this chapter which shall be presented to the Board [of Elections and Ethics], in writing, shall be transmitted to the Director without action by the Board . . . .").

5. 3 DCMR § 3703.2(b) (2007).

6. *Id.* § 3703.4. "A preliminary investigation conducted by OCF shall be strictly investigatory, for example, non-adversarial and non-adjudicator[y]." *Id.* § 3703.3.

7. *Id.* § 3704.1.

8. *Id.* § 3704.3(c).

9. *Id.* §§ 3704.4, 3707.

10. *Id.* §§ 3706.1, 3706.2. The action is begun by the filing of a written complaint. *Id.* § 408.1.

11. *See id.* §§ 400.3, 423; *see also* D.C.Code § 1–1103.05(b)(2).

12. 3 DCMR § 423.5

13. *See* D.C.Code § 1–1103.05(b).

14. D.C.Code § 1–1103.01(c); *see also id.* § 1–1107.01 (providing criminal penalties for campaign finance law violations).

15. 3 DCMR § 3705.1.

16. *Id.* § 3705.2.

17. *Id.* §§ 3705.4, 3709.12.

the Administrative Procedure Act.[18]

## II. Petitioners' Complaint to OCF and the Board

Petitioners are registered District of Columbia voters who reside in Ward 2. On August 28, 2008, they filed a complaint with OCF charging that Jack Evans, the incumbent Councilmember from Ward 2, had violated the District's campaign finance law by using government resources in his re-election campaign. Specifically, petitioners alleged, Evans had "improperly used his own Council office to take photographs of himself with [Metropolitan Police Department] Police Chief Cathy Lanier while she was on duty and in official uniform," and had used one of those photographs in a campaign advertisement published in *The Current*, a widely distributed local weekly newspaper, on August 13, 2008. This full-page ad urging readers to vote for Evans in the upcoming September 9 primary election featured a color photo of Chief Lanier standing arm-in-arm with Evans under the headline "Working Together for Ward 2." Petitioners complained that the ad "implied a clear endorsement of Evans by Chief Lanier."

Petitioners further alleged that the Evans campaign also had displayed the photograph of Evans and Chief Lanier on its website, but had removed it "soon after [petitioners] publicly protested the newspaper ad." And, according to the complaint, the advertisement had attracted unfavorable attention from other quarters as well: "[F]rom what we have read in the press," petitioners stated, "we believe Chief Lanier apparently did not know in advance that Mr. Evans would use her photograph with him in a campaign ad." "Further," petitioners reported, "the police union expressed concerns in the press that the photo made it appear that not only Lanier endorsed Evans, but that perhaps the entire department—as personified by the Chief—also endorsed him."

In response to the complaints from petitioners and others,[19] OCF opened a preliminary investigation and asked the Evans campaign to stop using the photograph. The campaign complied with that request. A few days later, on September 5, 2008, OCF initiated a full investigation into whether the campaign had used government resources for election purposes in violation of D.C.Code § 1–1106.51. In the course of that investigation, OCF received responses to the allegations from Councilmember Evans and Chief Lanier.

On November 20, 2008, OCF concluded its investigation and issued an order dismissing the complaint. OCF found that Evans had not violated Section 1–1106.51 "because the photograph was not taken for a campaign-related purpose and because Chief Lanier consented to pose with [Evans] in the photograph for a personal, not campaign-related, purpose."[20] Upon re-

---

18. *See id.* §§ 400, 423.

19. The Director of OCF reported that her office was notified of the Evans campaign advertisement by others besides petitioners, including members of the Fraternal Order of Police.

20. As Chief Lanier explained in her statement:

> I recall that the photograph in question was taken while [I was] present in the office of Councilmember Evans for a

standard meeting to discuss crime issues existing within Ward 2. As is customary, the Councilmember had several personal photographs displayed throughout his office in which he appeared with various officials and dignitaries. For that reason and under the belief the photograph would be used only for legitimate personal display, I agreed to appear in a photograph with Councilmember Evans. There was never any reason for me to believe that the photo would be used for an improper or prohibited purpose and

ceiving the dismissal order, petitioners filed a request for review by the Board. Evans was permitted to intervene in the review proceeding.

The issue of petitioners' standing to seek review was raised at a pre-hearing conference convened by the Board on January 5, 2009. The question, as the Board's representative explained, was whether petitioners were "adversely affected" by the OCF ruling so as to entitle them to Board review under 3 DCMR § 3705.4. The Board asked the parties to address that question in their pre-hearing briefs.

In response to the Board's request, petitioners' brief linked their standing to appeal OCF's dismissal of their complaint to their standing to lodge that complaint with OCF in the first place:

> As actual voters in the September 9, 2008 primary and November 4, 2008 general election, we filed a timely complaint in this matter with OCF. OCF accepted our complaint as duly filed. OCF then investigated the matter, issued findings, and ultimately rejected our complaint. Thus, it is undisputed that we had standing to file a complaint in this matter, and the OCF's disposition of our complaint, dismissing it with no action taken, meets the requirement of "adversely affected."

Petitioners did not identify any other respect in which they personally were affected adversely by OCF's order. They did argue, however, that OCF's ruling "would set a dangerous precedent," because it "would allow *any* D.C. elected official or candidate for public office to use a photo of the Police Chief, the Attorney General, or any other non-elected city employee any way he or she may choose in a newspaper campaign advertisement without penalty or reprimand for a violation of campaign or personnel regulations." In their opposing briefs, OCF and Evans argued that petitioners had failed to allege the kind of personal and concrete injury or threat of injury that is required by the Board's rule for standing to appeal.

The parties next addressed the standing issue at a hearing before the Board on January 24, 2009. To show that they were adversely affected by OCF's dismissal of their complaint, petitioners relied on their status as qualified Ward 2 voters who had supported and contributed time and money to Evans's opponents in the primary and general elections.[21] As voters, petitioners asserted, they had a stake in "fair and honest elections" with "fair campaign practices," and they feared the precedential effect of the OCF decision in future elections: it would "open[ ] the floodgates for exploiting the Chief of Police" and other government officials, and would allow "other candidates [to] do the same thing" as the Evans campaign had done. "To me,"

---

there was no intent on my part to participate in any such activity. At no time was I made aware that my appearance would be used—under any circumstances—to gain an improper benefit. Any such activity was done without my knowledge and consent.

Evans's response agreed with this account. The photograph was taken, Evans stated, as a personal memento of the occasion and not for a campaign purpose. It was one of many such photos "adorning his Council walls." Even if it happened to be a staff member who took the photograph, no government monies or property were used or created—the camera belonged to Evans, he paid for the film and the processing with his own funds, and the photo itself was his personal property, not that of the District government. It was not until months later, Evans explained, that his advertising agency selected the photo for use in his campaign to show his " 'law and order' bona fides."

21. Petitioner Elliott stated that she also served as a precinct captain for one of the candidates who opposed Evans.

petitioner Hanrahan stated, "that's a very serious injury that I and the citizens of the District of Columbia would experience, that public employees become fair game for any politician who runs for office." Moreover, as supporters of Evans's opponents, petitioners claimed they were injured because "the vote may well have been tainted." According to petitioner Mallof, the challenged advertisement "influenced votes" (though it was impossible to say how many), "[a]nd my injury is my guy lost." Mallof conceded that "a cure [for the improper ad] was necessary before" the election, not "after-the-fact," but argued that effective "redress is still possible" in the form of a fine ("however small or large") and clarification of the campaign finance law by the Board.

Petitioners also urged the Board to recognize that the criteria for standing to seek relief before an administrative agency need not be as "demanding" as the criteria for standing, derived from Article III of the Constitution, to assert a claim in federal court.

On January 28, 2009, the Board rendered its decision in an opinion and accompanying order. It ruled that petitioners had not shown they were "adversely affected" by OCF's dismissal of their complaint within the meaning of 3 DCMR § 3705.4 and accordingly denied their request for review.[22] Declaring that "[t]he phrase 'adversely affected' is not ambiguous and must be given its plain meaning," the Board found guidance as to that meaning in the District of Columbia Administrative Procedure Act ("DCAPA") and the dictionary. Noting that the DCAPA provides for judicial review by persons who are "adversely affected or aggrieved" by an administrative agency order or decision,[23] the Board viewed the terms "adversely affected" and "aggrieved" as essentially equivalent. And, citing a dictionary definition of the latter word,[24] the Board concluded that in order to obtain review of an OCF order, a party must show "a substantial grievance, a denial of some personal, pecuniary or property right, or the imposition of a burden or obligation" as a result of the order.

The Board found that petitioners did not meet that test. It rejected as "without merit" their argument that because they had standing to file the complaint with OCF in the first place, they necessarily had standing to seek review of an OCF order dismissing the complaint. That argument was fallacious, the Board explained, because under 3 DCMR § 3703(2)(b), "any employee or resident of the District of Columbia" may complain of a campaign finance law violation to OCF, whether or not the employee or resident has been affected adversely by it. "Simply put, an individual need not have 'standing' to file a complaint with OCF, and the mere act of filing a complaint with OCF does not render one adversely affected by either a violation of the campaign finance statute, or an OCF order dismissing a complaint alleging such a violation."

The Board also rejected petitioners' claim that they were adversely affected because the OCF order established a "dangerous precedent" for future elections. "The potential state of affairs described by [petitioners] is not only speculative," the

---

22. The regulation allows any "party" adversely affected by an OCF dismissal order to obtain review. The Board agreed that petitioners, having filed the complaint that OCF dismissed, were "parties" for this purpose.

23. D.C.Code § 2–510 (2001).

24. The Board cited to the definition of the word "aggrieved" in the term "aggrieved party," as it appears in BLACK's LAW DICTIONARY (6th ed. 1991).

Board held, "but also devoid of any hint of any adverse affect [sic] that is personal to them."

Finally, the Board held that to the extent petitioners predicated their standing on the claim that their candidate lost because the election was tainted, they were in the wrong forum to seek "any meaningful" relief. The Board could not redress that harm even if petitioners were able to prove it; petitioners' sole remedy would have been to ask the District of Columbia Court of Appeals to review and overturn the election.[25]

## III. Legal Discussion

Petitioners contend the Board erred as a matter of law in determining that they lacked standing to seek its review of OCF's order dismissing their complaint. They make two arguments. First, they claim the Board erred in "assuming, without analysis, that standing to seek *administrative* review under 3 DCMR § 3705.4 must be governed by the same standards that govern standing to seek *judicial* review under the Administrative Procedure Act, as constrained by [Article] III of the Constitution."[26] Citing the fact that an OCF investigation may be initiated on the complaint of "any" District of Columbia employee or resident, and invoking a dictionary definition of the word "adverse,"[27] petitioners ask us to "interpret the phrase 'any party adversely affected' in 3 DCMR § 3705.4 to include any person who participated in the OCF proceeding and whose position was rejected by the OCF."[28]

■ Second, petitioners argue, even if the Board was correct in applying "Article III rules of standing" to their request for review, they satisfied those rules because they suffered "injury in fact."[29] Petitioners contend that "Evans's advertisement falsely implying that he was endorsed by the Chief of Police, and the OCF finding that Evans had not violated the law prohibiting the use of government resources in a political campaign, diminished petitioners' ability to affect the outcome of the 2008 primary election and thereby caused petitioners concrete injury giving rise to standing before the Board."[30] Moreover, petitioners add, "the OCF decision, which finds no fault with candidate Evans's arguably unlawful conduct, . . . gives a green light to the intentional repetition of such abusive conduct by Councilmember Evans and others in future election campaigns— in which, as politically active citizens and voters, petitioners are likely to participate."[31]

25. *See* D.C.Code § 1–1001.11(b) (2001). The statute permits a voter to petition this court to review an election within seven days of the Board's certification of the results. To secure relief, a petitioner must show defects in the election process "serious enough to vitiate the election as a fair expression of the will of the registered qualified electors voting in the election." *Id.* § 1–1001.11(b)(2)(B); *see Jackson v. District of Columbia Bd. of Elections & Ethics,* 770 A.2d 79, 81 (D.C.2001).

26. Brief for Petitioners at 13 (emphasis in original).

27. Petitioners cite BLACK'S LAW DICTIONARY 58 (8th ed. 2004) (defining "adverse" to mean, *inter alia,* "having an opposing or contrary interest, concern, or position").

28. Brief for Petitioners at 16.

29. *Id.* at 5.

30. *Id.*

31. *Id.* We pause to observe that petitioners somewhat indiscriminately base their claim of standing on the assertion that the Evans campaign committed *two* distinct wrongs—its use of government resources in violation of D.C.Code § 1–1106.51 and its issuance of an ad that was misleading. But as the Board states in its brief (and as petitioners in fact agree), consistent with the First Amendment "it may not regulate core political speech in an effort to protect voters from potentially misleading or inaccurate speech, or sanction

## A. The Board's Construction of 3 DCMR § 3705.4

■ We first address petitioners' argument that the Board erred in construing 3 DCMR § 3705.4 to impose the same standing threshold for its review of OCF dismissal orders as the DCAPA imposes on judicial review of agency action. A preliminary issue is whether the Board actually has adopted the DCAPA standard, as opposed to a different, perhaps more demanding, test for standing. In construing the DCAPA, we have held that "[a] party has not been adversely affected or aggrieved by agency action unless, *inter alia,* it has suffered or will sustain some actual or threatened 'injury in fact' from the challenged agency action." [32] When the Board concluded that petitioners lacked standing, it did not advert explicitly to the "injury in fact" test or its established definition in our case law; nor did it cite our cases interpreting the phrase "adversely affected or aggrieved" in the DCAPA. (No previous decision of this court has construed the language of the Board rule in question here.) Rather, the Board stated that in order to obtain Board review of an OCF order, a party must show "a substantial

grievance, a denial of some personal, pecuniary or property right, or the imposition of a burden or obligation" as a result of the order.

In arguing that the Board applied Article III rules of standing, petitioners have construed the Board's articulation of the injury required as equivalent to the "injury in fact" test. At oral argument, the Board's counsel assured us that no deviation from that test was intended. We accept the clarification and accede to the parties' understanding that the Board construed 3 DCMR § 3705.4 to require a party seeking Board review of an OCF order to satisfy the injury-in-fact test.

Petitioners' challenge to the appropriateness of that construction founders under our deferential standard of review. Although petitioners argue in favor of a different construction, "[o]ur task is not to decide which among several competing interpretations best serves the regulatory purpose." [33] We must defer to the Board's interpretation of the regulation it has promulgated unless its interpretation is "plainly wrong or inconsistent with the governing statute." [34] "Even where the

such speech when it is deemed to be misleading or inaccurate." Brief for Respondent at 12. *See Citizens Comm. for the D.C. Video Lottery Terminal Initiative v. District of Columbia Bd. of Elections & Ethics,* 860 A.2d 813, 814–15 (D.C.2004) (referring to the "significant First Amendment concerns" raised in that case by the Board's imposition of sanctions for "false advertising" in connection with an initiative petition). In view of our disposition of this appeal, we need not decide whether or how First Amendment limits on the Board's authority affect petitioners' standing arguments.

**32.** *District Intown Props., Ltd., v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 680 A.2d 1373, 1377 (D.C.1996).

**33.** *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

**34.** *Kuri Bros., Inc. v. District of Columbia Bd. of Zoning Adjustment,* 891 A.2d 241, 244 (D.C. 2006); *see also, e.g., 1330 Conn. Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 714–15 (D.C.1995) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.") (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)); *Allen v. District of Columbia Bd. of Elections & Ethics,* 663 A.2d 489, 495 (D.C.1995) ("[W]e must defer to [the Board's] interpretation of the statute which it administers, and, especially, of the regulations which it has promulgated, so long as that interpretation is not plainly wrong or inconsistent with the legislative purpose.").

petitioner advances a more plausible reading of the regulations than that offered by the agency, it is the agency's choice that receives substantial deference." [35]

The Board's construction of 3 DCMR § 3705.4 to impose the same injury-in-fact standing requirement as the DCAPA cannot be described as plainly wrong or inconsistent with governing law. Having chosen to employ operative language in the regulation ("adversely affected") that mirrors a term of settled meaning in the DCAPA ("adversely affected or aggrieved"), and having decided to look to the DCAPA for guidance, the Board reasonably construed the language of the regulation in accordance with its meaning in the DCAPA. Nor does the Board's interpretation lead to an absurd or unreasonable result. That any District of Columbia resident or employee may trigger an investigation by lodging a complaint with OCF, the Board's investigative office, hardly means that any such complainant must be able to obtain full Board review when OCF finds the complaint to be without merit. Petitioners argue that under the Board's ruling, only candidates who are the subject of complaints and who lose before the OCF can obtain Board review, and thus that

"[e]rroneous OCF decisions that the law has been violated can be reviewed, but erroneous OCF decisions that the law has not been violated cannot be reviewed." [36] If that is so, petitioners do not explain why it would be an impermissible choice for the Board to make. [37] But we think the argument is overstated. On the facts of the present case, for example, we see no reason why a candidate who opposed Councilmember Evans in the primary election would have been unable to make the necessary injury-in-fact showing to seek review of OCF's order. As we discuss below, an opposing candidate could have predicated standing on the competitive injury arising from Evans's allegedly improper use of government resources to gain an advantage in the election. Nothing in the Board's opinion suggests it would have rejected an opposing candidate's request for review.

■ Petitioners also argue that "substantial deference" to the Board's construction of its regulation is misplaced in this case because, as the Supreme Court explained in *United States v. Mead Corp.*, [38] informal agency action is not entitled to so-called *Chevron* deference. [39] In-

---

**35.** *Trinity Broad. of Florida, Inc. v. Fed. Commc'ns Comm'n*, 341 U.S.App.D.C. 191, 198, 211 F.3d 618, 625 (2000) (internal quotation marks and brackets omitted).

**36.** Brief for Petitioners at 15–16.

**37.** *Cf. Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); *accord, J.C. & Assocs. v. District of Columbia Bd. of Appeals & Review*, 778 A.2d 296, 309 (D.C.2001).

**38.** 533 U.S. 218, 227–28, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

**39.** The term *"Chevron* deference" refers to the deference federal courts accord to certain

agency actions under the Supreme Court's decision in *Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Our doctrine of substantial deference to agency interpretations of the laws they administer and the regulations they have promulgated is based on *Chevron. See, e.g., Allen*, 663 A.2d at 495; *see also Reichley v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 244, 248 n. 4 (D.C.1987) ("Our standard of review of an adjudicative rule—according great weight to any reasonable construction of a regulatory statute by the agency—is the same as the standard applicable when an agency uses the rule-making mechanism to construe a statute pursuant to an implicit delegation of legislative authority to fill in the gaps or to resolve ambiguities.") (citing, *inter alia, Chevron*, 467 U.S. at 843–45, 104 S.Ct. 2778).

stead, such action receives the lesser degree of deference described in *Skidmore v. Swift & Co.*,[40] which essentially depends on its overall "power to persuade" the court.[41] However, while we doubt it would make a difference to our decision if we were to evaluate the Board's ruling under the less deferential *Skidmore* standard, that standard does not apply in this case. The ruling here was not an "informal" one: The Board interpreted its regulation after briefing and oral argument in a contested case proceeding under the DCAPA, and it did so in a written opinion that analyzed the language in question in its statutory and regulatory context. Petitioners say the opinion was informal because the Board did not publish it. We do not agree. For one thing, petitioners' premise is incorrect. Although the decision was not published in the District of Columbia Register, it was published on the Board's website, where it is available to this day.[42] We have not insisted that a formal agency decision in a contested case proceeding must be published in the D.C. Register to be entitled to our substantial deference; indeed, we have deferred in the past to the Board's interpretation of its own regula-

tions in an unpublished adjudicative decision.[43]

We likewise are unpersuaded by petitioners' argument that the Board's decision is "non-authoritative" (and hence not deserving of substantial deference) because "nothing in the D.C. election statute contemplates that the Board may issue formal, precedential orders in adjudicative matters such as this."[44] The campaign finance statute directs the Board to promulgate regulations, in accordance with the DCAPA, governing all OCF investigations of alleged campaign finance violations, specifically including regulations covering the presentation of evidence to the Board in an adversary proceeding, whether OCF finds the evidence sufficient to show a violation or not.[45] Moreover, the election statute also directs the Board in general terms to "[i]ssue such regulations ... as are necessary to carry out the purposes of ... Chapter 11 of this title [dealing with campaign finance and related matters]...."[46] The Board exercised its authority under these statutory provisions to issue the regulations pursuant to which it afforded petitioners an adjudicative hearing subject to the contested-case requirements of the DCAPA.[47] Those regu-

---

**40.** 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

**41.** *Mead,* 533 U.S. at 228, 121 S.Ct. 2164 ("The weight [accorded an agency] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). This court has recognized the distinction between *Chevron* and *Skidmore* deference. *See Esteños v. PAHO/WHO Fed. Credit Union,* 952 A.2d 878, 892 n. 15 (D.C.2008) (acknowledging that reduced deference may be owed to an agency's internal guidelines, such as its compliance manual).

**42.** *See David Mallof, et al., v. District of Columbia Office of Campaign Fin.,* http://dcboee. org/regulations/admin_order.asp?type=year& year=2009 (last visited on July 19, 2010).

**43.** *See Pendleton v. District of Columbia Bd. of Elections & Ethics,* 449 A.2d 301, 307 (D.C. 1982).

**44.** Reply Brief for Petitioners at 9.

**45.** D.C.Code § 1–1103.01(c).

**46.** *Id.* § 1–1001.05(a)(14).

**47.** *See* 3 DCMR §§ 423, 3705.4, 3709.13.

lations have the force of law.[48] Decisions in contested case proceedings generally are treated as having precedential effect,[49] and we see no reason to treat the Board's decision in an "adjudicative matter[ ] such as this" any differently.

### B. Petitioners' Claim of "Injury in Fact"

■ We turn to petitioners' claim that they have suffered "injury in fact." Petitioners claim that Councilmember Evans's campaign advertisement, and OCF's failure to sanction him for it, injured them in two respects: (1) by diminishing their ability as voters to affect the outcome of the 2008 primary election; and (2) by giving the "green light" to the repetition of such advertisements by Evans or other candidates in future elections. We are not persuaded that either of these grounds suffices to establish petitioners' standing.[50]

■ "Injury in fact" is one of several requirements of standing to obtain judicial review of agency action under the DCAPA.[51] It derives from the "case or controversy" requirement of Article III of the Constitution. As the Supreme Court explained in *Lujan v. Defenders of Wildlife*,[52] "the irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized,[53] and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely

48. See *Teachey v. Carver*, 736 A.2d 998, 1005 (D.C.1999).

49. See *Brentwood Liquors v. District of Columbia Alcoholic Beverage Control Bd.*, 661 A.2d 652, 656–57 (D.C.1995) (explaining that an agency must provide a satisfactory reasoned explanation for departing from prior precedent).

50. As the Board notes, in the proceedings below, petitioners did not claim that they had standing based on the impairment of their ability to affect the election's outcome. That is a contention raised for the first time on appeal. Ordinarily, "[i]n the absence of exceptional circumstances, this court will not entertain contentions not raised before the agency." *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 33 (D.C.1992). However, as the Board neither asks us to reject the claim as forfeited nor asserts that its capacity to respond has been prejudiced, we exercise our discretion to dispose of the claim on the merits.

51. In brief, the DCAPA requires a petitioner to show not only (1) that the challenged agen-

cy action caused her injury in fact, but also (2) that she is "assert[ing] more than a generalized grievance;" (3) that the interest she seeks to protect is "arguably within the zone of interests protected under the statute or constitutional guarantee in question;" (4) that "no clear legislative intent to withhold judicial review is apparent;" and (5) that there exists "a substantial probability that the requested relief would alleviate her asserted injury," i.e., that her injury can be redressed. *Miller v. District of Columbia Bd. of Zoning Adjustment*, 948 A.2d 571, 574–75 (D.C.2008) (internal quotation marks omitted). The DCAPA thus incorporates both constitutional (Article III) and so-called "prudential" prerequisites of standing. See *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206–07 (D.C.2002).

52. 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks, brackets, ellipses and citations omitted).

53. The term "particularized" means "the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n. 1, 112 S.Ct. 2130.

speculative, that the injury will be redressed by a favorable decision.

We evaluate petitioners' standing to obtain Board review of OCF's order in light of these requirements.

 We begin by considering petitioners' claim that OCF's order injured their ability to affect the electoral outcome in 2008. It might be supposed that the order could not have inflicted such injury because both the primary and general elections were already over when OCF issued the order, or that the occurrence of the elections rendered petitioners' claim moot.[54] Petitioners argue, however, that they sought to have OCF act on their complaint before the primary election was held, and that its delay in doing so (as well as the subsequent delays before the Board and on appeal) should not be allowed to deprive them of their standing or moot their claim. In general, petitioners argue, courts have held that "standing exists [in election rights cases] even though the election has already occurred,"[55] in large part because "if the passage of the election were enough to deprive plaintiffs of standing, election cases would, as a practical matter, be unreviewable."[56] On the other hand, "[w]hile the mootness exception for disputes capable of repetition yet evading review has been applied in the election context, that doctrine will not revive a dispute which became moot before the action commenced," because in the latter situation the plaintiff lacked standing at the outset.[57]

Thus, the viability of petitioners' claim that OCF injured their ability to affect the election depends, in the first instance, on when that claim arose and was presented. This would have been an issue for the Board to resolve in applying its regulations, but as petitioners did not raise this claim of injury until their appeal to this court—a defect we have chosen to overlook[58]—the Board cannot be faulted for not addressing it. In effect, though, petitioners are arguing that they were injured not merely by OCF's order dismissing their complaint against Evans, but also (indeed, primarily) by OCF's failure to take other action on that complaint in a timely, effective fashion, before the primary election was held. From petitioners' standpoint, OCF's inaction both harmed them and delayed their presentation of their basic claim to the Board. Moreover, the Board treated petitioners as "parties" within the meaning of 3 DCMR § 3705.4 because they were the complainants who triggered OCF's investigation,[59] i.e., from the outset of that proceeding. On balance, therefore, we think it appropriate to treat petitioners' claim as though it had originated and been asserted before the primary election, because in practical effect that

---

54. The concepts of standing and mootness should not be confused. "Standing is determined at the time the complaint is filed, while mootness ensures that the requisite personal stake necessary at the outset of litigation continues through its course." *Natural Law Party v. Fed. Election Comm'n,* 111 F.Supp.2d 33, 40 (D.D.C.2000) (citing *Friends of Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 190–91, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Lack of standing always deprives a court of the power to adjudicate a claim, but the doctrine of mootness is subject to recognized exceptions that allow a court to proceed to judgment. *See id.*

55. *Owen v. Mulligan,* 640 F.2d 1130, 1133 (9th Cir.1981).

56. *Natural Law Party,* 111 F.Supp.2d at 50.

57. *Renne v. Geary,* 501 U.S. 312, 320, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (citation omitted).

58. *See supra,* n. 50.

59. *See supra,* n. 22.

was when OCF failed to grant them relief on their complaint. No argument is made to us that petitioners were tardy in presenting their complaint to OCF, or that it would have been impossible for OCF to issue its order prior to the primary and general elections.

■■■■■■ Whether petitioners' standing to seek relief at the Board level evaporated after the Evans campaign voluntarily ceased using the photograph of Evans with Chief Lanier in its advertising is another question, however. "[A] plaintiff must demonstrate standing separately for each form of relief sought." [60] In the circumstances of this case, it is difficult to perceive what additional relief petitioners had standing to seek (beyond the Evans campaign's compliance with OCF's request not to use the photograph). The usual rule, of course, is that a defendant's voluntary cessation of a challenged practice does not moot the case, because if it did, the defendant would be free to resume the practice.[61] That rationale lacks force here; the Evans campaign cannot resume its use of the photograph because the campaign is over (and petitioners' concerns about future campaigns are highly speculative at best). Thus, there would be no point to the issuance of a cease and desist order. While OCF could have imposed a monetary fine on Evans had it found he violated

D.C.Code § 1–1106.51,[62] petitioners would not have been entitled to receive that fine (which would go to the District), and thus it would not have redressed their claimed injury. Nor would it have protected them from any non-speculative future harm. As a rule, "citizen suitors lack standing to seek civil penalties for violations that have abated by the time of suit" absent a realistic threat that a violation will recur.[63] Similarly, petitioners have no standing to require the Board to refer their complaint to the Office of the United States Attorney for criminal prosecution.[64]

■■■■■■ That said, the Board disposed of petitioners' request for review on the basis of lack of injury in fact, not non-redressability or mootness. As petitioners argue, generally speaking, "[a]n administrative order can only be sustained on the grounds relied on by the agency." [65] Although that precept has its exceptions, we need not explore their applicability here. The "injury in fact" question is dispositive.

While this court has never before considered a claim of voter standing based on injury to the voters' ability to influence an election as a result of campaign finance violations, federal appellate courts that have considered claims factually comparable to petitioners' have found them wanting. Foremost among those cases is *Gottlieb v. Federal Election Commission.*[66] In

**60.** *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

**61.** *See id.* at 189, 120 S.Ct. 693.

**62.** *See* 3 DCMR § 3711.1(kk) (permitting OCF to impose a $2,000 fine for using District government resources in campaign-related activities); *id.* § 3711.1(b) ("A fine shall attach for each day of non-compliance for each violation.").

**63.** *See Laidlaw*, 528 U.S. at 187–88, 120 S.Ct. 693; *Steel Co. v. Citizens for a Better Environ-*

*ment*, 523 U.S. 83, 106–07, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**64.** *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").

**65.** *Kralick v. District of Columbia Dep't of Employment Servs.*, 842 A.2d 705, 713 (D.C. 2004) (internal quotation marks omitted).

**66.** 330 U.S.App.D.C. 104, 143 F.3d 618 (1998).

that post-*Lujan* case, individual voters (among others) sought judicial review of the FEC's dismissal of a complaint charging President Clinton's 1992 primary campaign committee with campaign finance violations. The voters based their standing to appeal on the injury to their "ability to influence the political process": they claimed "their support for rival candidates was rendered less effective because the Clinton campaign had greater funds with which to sway voters" in the general election as a result of the violations.[67] The D.C. Circuit rejected this argument, finding that the purported injury "rest[ed] on gross speculation" and was "far too fanciful to merit treatment as an 'injury in fact.'"[68] For one thing, the voters could not establish that any excess funds actually enhanced the Clinton campaign's ability to influence the electorate (or diminished his opponents' ability to do so). "And under any circumstances," the court added,

> it is unclear how their influence as *voters* was diminished. The Clinton campaign may have received extra funds, but this did not prevent the voters from engaging in any of the numerous activities open to all politically active citizens. They were free to raise funds to support their own candidates, volunteer their time to work on those campaigns, and vote for the candidate of their choice.[69]

An earlier, pre-*Lujan* decision of the same court reached similar conclusions. In *Winpisinger v. Watson*,[70] supporters of

Senator Edward Kennedy sued the Carter–Mondale Committee and members of President Carter's administration, alleging that the defendants had "illegally employed their public authority and expended federal funds to promote the President's renomination."[71] In their capacity as voters, the plaintiffs charged that the challenged practices "diminish[ed], dilute[d] and nullif[ied]" their votes, their lawful contributions of money to Senator Kennedy's campaign, and "their other efforts to nominate the candidates of their choice."[72] The district court dismissed the action for lack of standing. The D.C. Circuit affirmed, agreeing that the plaintiffs had failed to allege concrete, non-speculative injury, and that "[t]he variety of factors operating on the electorate at any given time would require extreme speculation to establish a relationship between the defendants' alleged conduct, and the plaintiffs' injury."[73]

To cite another example, in *Becker v. Federal Election Commission*,[74] the First Circuit considered a challenge by presidential candidate Ralph Nader and his supporters to regulations permitting corporate financial sponsorship of the presidential debates, which allegedly had the injurious effect of preventing him from participating in the debates (because Nader refused to accept corporate contributions as a matter of political principle). The court held that Nader himself had standing to pursue the challenge, but that the voter plaintiffs— who claimed they were harmed both di-

---

67. *Id.*, 330 U.S.App.D.C. at 107, 143 F.3d at 621.

68. *Id.*

69. *Id.*, 330 U.S.App.D.C. at 108, 143 F.3d at 622.

70. 202 U.S.App.D.C. 133, 628 F.2d 133 (1980).

71. *Id.*, 202 U.S.App.D.C. at 135, 628 F.2d at 135.

72. *Id.*, 202 U.S.App.D.C. at 137, 628 F.2d at 137 (footnote omitted).

73. *Id.* (quoting the decision of the district court).

74. 230 F.3d 381 (1st Cir.2000).

rectly, "by the corruption of the political process allegedly caused by corporate sponsorship of the debates," and derivatively, by virtue of the injury suffered by Nader, the candidate whom they supported—did not.[75] "As to the first argument," the court explained, "the harm done to the general public by corruption of the political process is not a sufficiently concrete, personalized injury to establish standing." [76] And "[r]egardless of Nader's injury," the court said,

> his supporters remain fully able to advocate for his candidacy and to cast their votes in his favor. [Citations omitted] The only derivative harm Nader's supporters can possibly assert is that their preferred candidate now has less chance of being elected. Such "harm," however, is hardly a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing.[77]

Similarly, in *Colorado Taxpayers Union, Inc. v. Romer*,[78] the Tenth Circuit held that the Libertarian Party and its members lacked standing to sue the Governor of Colorado for improperly using state resources to defeat a ballot initiative in the general election. The court found "[a]ppellants' argument that they were forced to counteract the Governor's activities through the expenditure of additional funds" to be "purely conjectural," and that the Governor's activities did not impact the ability of the Libertarian Party or its members to associate, speak on behalf of the amendment, or vote for it.[79]

No two cases are identical, and we do not necessarily endorse everything said in the foregoing cases, but they are instructive. In uniformly holding that voters could not satisfy Article III standing requirements by relying on the impairment of their ability to influence an election allegedly caused by their political opponent's use of forbidden resources, the courts in those cases rejected the gist of petitioners' standing claim here. The reasoning of those cases applies to petitioners' claim with equal force. The purported diminishment of petitioners' effectiveness as voters as a result of the Evans campaign's advertisement (or as a result of OCF's failure to penalize Evans for that advertisement) does not satisfy the requirements of "injury in fact": it is neither "concrete" nor "particularized." At best, it is "conjectural" rather than "actual" or "imminent." Indeed, if anything, the record affirmatively suggests that petitioners and voters agreeing with them were effective in countering the challenged advertisement: according to petitioners' complaint, their public protests, together with those of the police union, embarrassed the Evans campaign and induced it to pull the ad.

Petitioners say OCF's failure to find that Evans violated the law deprived them of information they could have used against Evans during the campaign. That purported "informational injury" is not

---

75. *Id.* at 389.

76. *Id.*

77. *Id.,* 230 F.3d at 390 (citing, *inter alia, Gottlieb* ); *see also Crist v. Comm'n on Presidential Debates,* 262 F.3d 193, 195 (2d Cir. 2001) (affirming dismissal for lack of standing of voter's action challenging restrictions on third-party-candidate participation in presidential debates; "a voter fails to present an injury-in-fact when the alleged harm is ab-

stract and widely shared or is only derivative of a harm experienced by a candidate").

78. 963 F.2d 1394 (10th Cir.1992).

79. *Id.,* 963 F.2d at 1397. *See also Kardules v. City of Columbus,* 95 F.3d 1335, 1349 (6th Cir.1996) (distinguishing "classic vote dilution cases involv[ing] injuries that can be established with mathematical certainty," such as the apportionment cases).

sufficient to show injury in fact, however. The Supreme Court's decision in *Fed. Election Commission v. Akins*,[80] on which petitioners chiefly rely, does not support their argument. In *Akins*, a group of voters challenged the FEC's determination that the American Israel Public Affairs Committee (AIPAC) was not subject to Federal Election Campaign Act (FECA) requirements that "political committees" disclose their membership, contributions and expenditures. The voters claimed their receipt of that information "would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election."[81] In finding that the voters had standing to pursue their challenge, the Court held that their "injury in fact" consisted of their "inability to obtain information ... that, on [the voters'] view of the law, *the statute requires that AIPAC make public*."[82] The existence of a specific disclosure requirement in FECA was the critical point, for as the Court explained, it previously had "held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."[83]

 Petitioners did not charge the Evans campaign with violating any statutory disclosure requirement; indeed, they are not trying to have the Board force Evans to disclose any information. During the primary campaign, petitioners had and were able to use the relevant facts about the photograph of Evans with Chief Lanier. Petitioners merely sought a declaration by OCF and the Board that Evans violated the campaign finance law. The withholding of that kind of "information" does not cause the type of injury recognized in *Akins* and cannot suffice to support standing. "To hold that a plaintiff can establish injury in fact merely by alleging that he has been deprived of the knowledge as to whether a violation of the law has occurred would be tantamount to recognizing a justiciable interest in the enforcement of the law."[84] Article III standing rules do not recognize such an interest as sufficient.[85]

This does not mean that a *candidate* opposing Evans necessarily would have lacked standing to seek relief from his putative misuse of government resources in the campaign. The question is not before us in this case, but the position of a candidate differs from that of a mere voter. A campaign finance law violation might give the violator an unfair advantage over an opposing candidate in the electoral contest of public appeal and per-

**80.** 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998).

**81.** *Id.*, 524 U.S. at 21, 118 S.Ct. 1777.

**82.** *Id.* (emphasis added).

**83.** *Id.* (citing *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (involving withholding of information subject to disclosure under the Federal Advisory Committee Act), and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (involving violation of statute conferring on all persons a right to information about housing availability)).

**84.** *Common Cause v. Fed. Election Comm'n*, 323 U.S.App.D.C. 359, 364, 108 F.3d 413, 418 (1997).

**85.** *See, e.g., Lujan*, 504 U.S. at 573–78, 112 S.Ct. 2130; *see also Fairchild v. Hughes*, 258 U.S. 126, 129, 42 S.Ct. 274, 66 L.Ed. 499 (1922) ("Plaintiff has [asserted] only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted.").

suasion. When a candidate's ability to compete for political support on a level playing field has been threatened or compromised in that way, the candidate may have sufficient "competitive" or "procedural" injury to satisfy the "injury-in-fact" requirement of Article III.[86] But even when that is so, the merely "derivative" injury to voters who support the disadvantaged candidate is, in itself, too attenuated, insubstantial and unparticularized to afford them standing as well.[87]

From what we have said, it almost goes without saying that petitioners do not fare any better with their claim that OCF's order injured them by setting a precedent that will allow Evans or other candidates to misuse government resources to create campaign advertisements in future elections in which petitioners are likely to participate as voters. The threatened harm that petitioners posit is neither concrete nor particularized; it is neither actual nor imminent; as the Board said, it is "not only speculative, but also devoid of any hint of any adverse [e]ffect that is personal to them." Indeed, we need only add that OCF's order is not precedential at all; as petitioners themselves concede in their brief, OCF's " 'decisions' are only recommendations. . . . OCF is not an agency empowered to take final administrative action; final action must come from the Board." [88] And the Board did not render a precedential decision on the merits of petitioners' complaint against Evans.

## IV. Conclusion

For the foregoing reasons, we affirm the order of the Board of Elections and Ethics denying petitioners' request for review of the dismissal of their complaint by the Office of Campaign Finance.

*So ordered.*

---

**86.** *See, e.g., Shays v. Fed. Election Comm'n,* 367 U.S.App.D.C. 185, 192–201, 414 F.3d 76, 83–92 (2005); *Buchanan v. Fed. Election Comm'n,* 112 F.Supp.2d 58, 63–64 (D.D.C. 2000) (citing cases).

**87.** *Gottlieb v. Fed. Election Comm'n,* 330 U.S.App.D.C. 104, 108, 143 F.3d 618, 622 (1998).

**88.** Brief for Petitioners at 15.